UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————————x

SMALL BUSINESS BODYGUARD INC.,
      Plaintiff/Counterclaim-Defendant,

    -against-

HOUSE OF MOXIE, INC.,
      Defendant/Counterclaim-Plaintiff,
    -against-

RACHEL RODGERS LAW OFFICE, PC
and RACHEL RODGERS,
      Counterclaim-Defendants.

————————————————————————x

| USDC SDNY |
| --- |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: |
| DATE FILED: 3/20/15 |

No. 14-cv-7170 (CM)

OPINION CONSTRUING UNAMBIGUOUS CONTRACT TERM

McMahon, J.:

    Presently before the Court is Plaintiff's motion for a preliminary injunction against the defendant's new business, Sentences & Money. The Court entered a temporary restraining order preventing the defendant from conducting any scheduled Sentences & Money seminars and ordering that the website be temporarily disabled on March 17, 2015. A hearing on the motion is presently scheduled for March 30, 2015. This preliminary ruling will determine the scope of what needs to be decided at that hearing.

    At issue is whether Defendant House of Moxie (HOM) violated the terms of the parties' Joint Venture Dissolution Agreement when it set up a web site/e-seminar business in direct competition with the business of its former joint venture partner, Plaintiff Small Business Bodyguard, Inc., (SBBI). Plaintiff and defendant were briefly partners in a joint venture to market SBBI's product, "Small Business Bodyguard," an e-book and related media that provide

small business owners with advice and information regarding the formation and administration of small businesses. The SBBI e-book includes samples of contracts, agreements, disclaimers, and other legal documents, and advises readers on how to use specific legal agreements to protect one's small business against liability. One of SBBI's principals is Rachel Rodgers, an attorney who operates a sole practice, the Rachel Rodgers Law Office, PC. Rodgers and her firm are third party counterclaim defendants in this action.

In June 2014, the parties dissolved their joint venture in an aptly named Joint Venture Dissolution Agreement (JVDA), the salient terms of which are as follows:

(1) SBBI[1] purchased HOMs interest in the SBB e-book and SBB assets in exchange for three installment payments totaling $15,000 and certain commission payments.

(2) HOM received a non-revocable license to market, promote and sell the SBB e-book, and to use all associated intellectual property for that purpose (i.e., trademarks) for a period of three years.

Article 11 of the JVDA is entitled "Non-Competition." In pertinent part, it provides:

11.1 During the term of this Agreement, HOM (whether directly or indirectly, for compensation or not, for HOM's own account or on behalf of another) will not become involved or engaged in a business, or plan to become involved or engaged in a business that provides legal services, or sells products or goods (including books, e-books, and other works of authorship) that contain legal advice.

The Order to Show Cause

On March 16, 2015, this Court received, in the United States Mail, a document entitled Plaintiff's *Ex Parte* Application for a Temporary Restraining Order to Disable Certain Websites and Order to Show Cause for Preliminary Injunction. (Docket # 64.) The document was filed on

---

[1] At the time that the parties entered into the JVDA on June 1, 2014, SBBI was known as Rachel Rodgers Consulting Inc. (RRC). RRC has since changed its name to SBBI. For ease of understanding this opinion as a whole, the court will use SBBI in place of RRC when referencing the terms of the JVDA.

ECF sometime the previous Friday. It was not brought to the Court's attention at the time it was filed.[2]

The application urged that HOM—and its counsel of record in this matter, the Cloudigy Law Firm—had just set up an e-business, Sentences & Money, in direct competition with SBBI's product, and was soliciting enrollment for an e-seminar to be held on Tuesday, March 17, 2015. The Sentences & Money website advertises "a 4-week online mentorship program for aspiring professional writers who want to stop screwing around—and start making real money." The website outlines the course curriculum, which includes an introduction to writing as a profession and setting up a smart business model, how to attract clients and how to negotiate contract pricing, as well as a how-to section for "Proposals, Quotes, Contracts & Service Agreements." The website states, "We'll walk you step-by-step through House of Moxie's own client service agreement, what each section means, and what you absolutely need to have in your own." It then goes on to describe topics relating to client services, managing time, and how to accomplish one's goals as a professional writer.

The website introduces three special guest experts: (1) HOM's tax attorney, "who will help you understand the accounting pieces of the puzzle," (2) an award-winning professional copywriter, and (3) Antigone Peyton, who is "Founder & CEO of Cloudigy Law, specializing in intellectual property litigation and strategic counseling around patents, trademarks, copyrights, unfair competition, DMCA violations, and acting as lead counsel in civil lawsuits across the United States." It also notes that Cloudigy Law is HOM's official intellectual property counsel.

---

[2] Counsel seemed to think that the Court would receive instant notification of the filing of this emergency application. In fact, given the volume of daily filings addressed to each judge, most of us simply receive a list of all filings on the next business day after they are made. We rely on counsel to alert us to an extraordinary event. An attorney who wants emergency relief would do well to bring it to the court's attention the old fashioned and still most effective way – by pounding on the door and demanding to see a judge.

SBBI argued that HOM's participation in this business violated section 11.1 of the JVDA, because the new business was a business that "sells products or goods (including book, e-books, and other works of authorship) that contain legal advice."

The Court refused to entertain the TRO application *ex parte* and ordered an emergency hearing for March 17 at 2 PM.

After the hearing, I concluded that a TRO should issue until the hearing on the motion for a preliminary injunction, which, as noted above, I scheduled for March 30, 2015. A written order to that effect issued on March 19, as part of the Court's denial of HOM's motion to reconsider.

At the hearing, HOM argued that its new business venture was not one that sold "products or goods (including books, e-books, and other works of authorship) that contain legal advice." The Court noted that the scope of the March 30, 2015 hearing would be affected by whether the clause "contain legal advice" was ambiguous or not. If the clause were unambiguous, it could be construed by the court as a matter of law, and the hearing would simply be directed toward an examination of the web site; If, however, the clause were ambiguous, we would also have to take parol evidence about the meaning of the phrase "contain legal advice"—not evidence about the parties' subjective understanding of what that term might mean (which is inadmissible), but evidence about drafts and discussions of both that phrase and the subject of non-competition generally during the negotiation of the JVDA.

I directed the parties to brief the issue of ambiguity by noon on March 19. They have done so.

### General Principles of Contract Construction

The parties elected to have New York law govern the construction of the JVDA agreement. (JVDA § 7.1) I apply it here.

4

"The primary objective of a court in interpreting a contract is to give effect to the intent of the parties as revealed by the language of their agreement." *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 157 (2d Cir. 2000). When interpreting a contract, "'words and phrases . . . should be given their plain meaning,' and the contract 'should be construed so as to give full meaning and effect to all of its provisions.'" *LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) (quoting *Shaw Group, Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 121 (2d Cir. 2003)). While a court is bound by plain terms of the agreement and cannot "strain language beyond its reasonable and ordinary meaning," *Shaw Group*, 322 F.3d at 124, an interpretation that would render one or more clause of a contract superfluous is to be avoided.

In the ordinary course, New York follows the rule of *contra preferentum*: that is, any ambiguity in a contract is construed against its drafter if one party was responsible for the drafting. *See, e.g.*, *Guardian Life Ins. Co. of Am. v. Schaefer*, 70 N.Y.2d 888, 890 (N.Y. 1987). In this case, the parties have abjured *contra preferentum*. The contract identifies HOM as the draftsman, but states, "It is expressly understood and agreed that this Agreement will not be construed against HOM as the party drafting the original version of it." (JVDA § 12.)[3] That section then goes on to impose its own rule of construction; it says, "[E]ach provision of this Agreement will be construed in a manner that is fair to both parties."

This Court is sitting in equity on this application for injunctive relief and so is quite comfortable applying the standard that was chosen by the parties themselves, whether interpreting Section 11.1 or any other term of the JVDA.

---

[3] HOM is not free to vary that statement, which appears within the four corners of the contract and is perfectly unambiguous, by suggesting that SBBI or Rachel Rodgers actually drafted the JVDA or by offering drafts of the document allegedly authored by Rodgers.

5

Standard for Determining Ambiguity

"Ascertaining whether or not a writing is ambiguous is a question of law for the trial court." *Sayers v. Rochester Tsel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1094 (2d Cir. 1993). "Contract language is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Id.* (citations and quotations omitted).

Under New York law,

an agreement is unambiguous if the language it uses has a definite and precise meaning, unattended by danger of misconception in the purport of the agreement itself, and concerning which there is no reasonable basis for a difference of opinion. Ambiguity in a contract arises when the contract, read as a whole, fails to disclose its purpose and the parties' intent or when specific language is susceptible of two reasonable interpretations.

*Ellington v. EMI Music, Inc.*, 24 N.Y.3d 239, 244-45 (N.Y. 2014) (internal quotations and citations omitted).

In their briefs, the parties both assert that the phrase "containing legal advice" is unambiguous, although, predictably, they assign different meanings to that term. They do not, however, discuss the pertinent legal principles. In particular, they do not so much as mention the three steps that New York courts must follow when deciding whether a contract term is ambiguous or not:

1 – Examine the entire contract and consider the relation of the parties and the circumstances under which it was executed, interpreting particular words . . . *not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby*[;]

6

2 – assign[] each term a "fair and reasonable" or "reasonable and ordinary" meaning[;]

3 – adopt an interpretation that will not operate to leave a provision of a contract without force and effect.

*JA Apparel Corp. v. Abboud*, 568 F.3d 390, 405 (2d Cir. 2009) (internal citations and quotations omitted) (emphasis added) (applying New York law).

The term to be construed here is "legal advice," as used in the phrase "sells products or goods (including books, e-books and other works of authorship) containing legal advice," which appears in Section 11 of the JVDA, the section entitled "Non-Competition." Unlike the parties, I will analyze the phrase in accordance with the three *JA Apparel* principles.

### "Legal Advice" as a Term of Art

The term "legal advice" of course has a special meaning within the legal profession. It describes the application of legal principles to a particular set of facts, normally within the context of an attorney-client relationship (also, of course, a term of art). Indeed, the entry for "legal advice" in the current edition of Black's Law Dictionary simply directs the reader to the entry for "Advice of Counsel," which in turn is primarily defined as "The guidance given by lawyers to their clients." Black's Law Dictionary (10th ed. 2014).

Courts and professional associations are frequently called upon to consider whether "legal advice" has been rendered in order to decide questions of, *inter alia*, attorney client privilege, the unauthorized practice of law, and the bounds of professional conduct. Such opinions routinely state or presuppose that "legal advice" is not merely general advice that mentions the law or legal principles (otherwise bar exam preparation courses would create tens of thousands of attorney client relationships every summer), but rather the application of legal principles to someone's personal predicament.

7

For example: in *Fisher v. United States*, 425 US 391, 403 (1976), the Supreme Court

used "legal advice" in the context of explaining the importance of the attorney-client privilege

> As a practical matter, if the client knows that damaging information could more readily be obtained from the attorney following disclosure than from himself in the absence of disclosure, the client would be reluctant to confide in his lawyer and it would be difficult to obtain fully informed *legal advice*

(emphasis added).

In *In re County of Erie*, 473 F.3d 413, 419–20 (2d Cir. 2007), the Second Circuit defined

the term as follows:

> Fundamentally, *legal advice* involves the interpretation and application of legal principles to guide future conduct or to assess past conduct. . . . It requires a lawyer to rely on legal education and experience to inform judgment.

*Id.* (citing *Ball v. U.S. Fid. & Guar. Co.*, No. M8–85, 1989 WL 135903, at \*1 (S.D.N.Y. Nov. 8,

1989) (reasoning that legal advice "involve[s] the judgment of a lawyer *in his capacity as a*

*lawyer*"). (emphasis added).

In *Fox News Network, LLC v. U.S. Dep't of Treasury*, 911 F. Supp. 2d 261, 271

(S.D.N.Y. 2012), this Court recognized the different status accorded to legal advice, as opposed

to other important types of professional advice:

> The attorney-client privilege protects only legal advice, not economic, business, or policy advice.

"Legal advice" in the sense described above can be given only by one licensed to practice

law. In *Spivak v. Sachs*, 16 N.Y.2d 163, 166 (1965), the New York Court of Appeals observed:

> It is settled that the practice of law forbidden in this State by section 270 of the Penal Law [recodified as Judiciary Law §478] to all but duly licensed New York attorneys includes legal advice and counsel as well as appearing in the courts and holding oneself out as a lawyer.

And indeed, in the one and only case mentioned by SBBI in its brief on this issue, the purveyor of a do-it-yourself "Divorce Yourself Kit" was held not to be engaged in the unauthorized practice of law precisely because the information conveyed in his kit was not "legal advice." *State v. Winder*, 42 A.D.2d 1039, 1039 (N.Y. App. Div. 4th Dep't 1793). In contrast to the "legal advice" offered during a lawyer's "personal contacts regarding particular problems," the "Divorce Yourself" kit did not constitute legal advice because, "at most," it "assume[d] to offer general advice on common problems, and d[id] not purport to give personal advice on a specific problem peculiar to a designated or readily identified person." *Id.* at 1039-40.

*Winder* followed the rule of *New York Lawyers' Assn. v. Dacey*, 21 N.Y.2d 694, 694 (N.Y. 1967). Mr. Dacey—who was not a lawyer—stood accused of engaging in the unauthorized practice of law for publishing a book entitled "How to Avoid Probate!" As HOM argues in its brief, the New York Court of Appeals rejected the notion that a book addressed to the general public could constitute legal advice:

> It could not be claimed that the publication of a legal text which purported to say what the law is amounts to legal practice, and the mere fact that the principles or rules stated in the text may be accepted by a particular reader as a solution to his problem, does not affect the matter, and that the publication of a multitude of forms for all manner of legal situations is a commonplace activity . . . and that conjoining of the text and the forms with advice as to how the forms should be filled out does not constitute the unlawful practice of law . . .

*Id.* at 694 (adopting dissenting opinion below).

The *Dacey* rule still controls practice in New York. The New York State Bar Association Committee On Professional Ethics opinion entitled "Legal Advice to Unrepresented Person," N.Y.S.B.A. Eth. Op. 898, 2011 WL 7784111 (Dec. 19, 2011) explains:

> it is in the nature of giving legal advice that a lawyer exercises professional judgment to apply legal principles to particular facts, and to impart some particular advice rather than some other possible advice so as to help guide decisions of the recipient.

The Association went on to explain Rule 4.3 of the New York Rules of Professional Conduct, which prohibits a lawyer is prohibited from giving legal advice to a person who is not represented by counsel—other than the advice to go get a lawyer from whom real legal advice could be obtained. N.Y.S.B.A. Eth. Op. 898, 2011 WL 7784111 (Dec. 19, 2011).

Lawyers, can, however, "author articles of general legal information in a regularly distributed news bulletin so long as he does not answer specific questions of law submitted by readers seeking legal advice and does not appear to solicit legal business," without committing an ethical violation. Official Comment to N.Y. Rules of Prof. Conduct, Rule 7.1 [22 NYCRR § 1200.0] (citing N.Y. State Bar Ass'n, Ethics Op. 67-66). Were that not the rule, lawyers could never write articles about legal topics or appear on continuing education panels and the like. The critical element is that, in the absence of an attorney-client relationship, the lawyer is limited to offering "general legal information" or engaging in activities of an essentially educational nature.

In light of these and other authorities—including the Black's Law Dictionary definition cited above, *Dacey* and *Winder*—HOM and its counsel essentially argue that "legal advice" is a term of art, limited to the rendering of particularized advice to a client by one licensed to practice law—and that this must be what the term means as used in the JVDA.

HOM also suggests that the "plain meaning of 'legal advice' does not encompass a broad array of business advice, *nor does it encompass the provision of general information about the law*." (Docket #71) (emphasis added). Defendant insists that, at the preliminary injunction hearing, and under the term of art definition of "legal advice," it will demonstrate that it is not engaging in a business that sells any product, e-book or other work of authorship containing "legal advice."

10

SBBI fails to come to grips with HOM's argument.[4] In fact, while insisting that the term is unambiguous, SBBI does not even define it. It simply insists that "legal advice" does not require the creation of an attorney-client relationship and can be understood as consisting of exactly what HOM is offering to its customers. As noted above, the only authority SBBI cites for this proposition is *Dacey*, the import of which the Plaintiff has clearly misunderstood.[5]

---

[4] At page 1 of its brief, SBBI actually argues that the court did not direct anyone to brief the issue of the ambiguity or unambiguity of "legal advice," and insists that HOM "misconstrues the purpose of this briefing exercise." Actually, it is SBBI that misconstrues what I told the parties to do—HOM understood me perfectly. This may explain why SBBI's "brief" is utterly and completely inadequate. Fortunately for plaintiff, this is not moot court; the better brief does not necessarily win.

[5] Of course, "whether an ambiguity exists must be ascertained from the face of an agreement without regarding to extrinsic evidence." *Reiss v. Fin. Performance Corp.*, 97 N.Y.2d 195, 199, 764 N.E.2d 958, 961 (2001) (internal quotations and citations omitted). However, I note that the court has located on SBBI's own web site a disclaimer that uses the phrase "legal advice" in exactly the manner described by HOM—that is, to mean the rendering of particularized advice to a client by one licensed to practice law:

> We think it goes without saying (but we're gonna say it anyway because, ya know, covering our ass and all that), the legal resources provided within this website including the legal clinic for small business owners delivered via email, live events including webinars and screencasts educating business owners about laws affecting their businesses and the digital, full-length legal resource available for purchase *are resources for educational and informational purposes only* and should not take the place of hiring an attorney.

> Using this website and the legal resources, paid and free, *does not create an Attorney-Client relationship* between you and Small Business Bodyguard, Inc. or their founders (that's us!). *Customized legal advice is not provided* within this website or any of the resources available for sale. Instead, Small Business Bodyguard is a legal resource designed to make you aware of the key legal needs of your business and provide tools you can use to meet those needs.

> Small Business Bodyguard, Inc. is not a law firm. *If you need legal advice, you should hire an attorney.* Within the full-length legal resource available for purchase, we provide a directory of lawyers and pro bono legal service providers.

11

This Court has no difficulty concluding that "legal advice" is a term of art when used in the context of attorney-client privilege, attorney ethics and the unauthorized practice of law, and that in that context, it means exactly what HOM says it means.

However, I cannot construe the term "legal advice" *as it is used in this contract* in the manner HOM suggests without running afoul of every principle that *JA Apparel* requires courts to consult when construing a contract.

### "Legal Advice" As Used in the JVDA

The problem with HOM's argument is that we are not here deciding whether a privileged communication has occurred, or whether someone has engaged in the unauthorized practice of law. We are interpreting a contract.

Neither party has bothered to discuss the term "legal advice" in the context of the contract, as required by *JA Apparel*. The question is whether the term is unambiguous as used in the JVDA—a particular contract between two corporate entities, neither of which is licensed to practice law—applying the three prongs of the test mandated by the Second Circuit: (1) interpreting the words of the contract in light of the contract as a whole and the obligations of the parties thereunder, (2) giving the words a fair and reasonable interpretation, and (3) not interpreting words in a way that would render some provision of the contract a nullity.

Viewed through the prism of *JA Apparel*, it is perfectly obvious that the term "legal advice" as used in Section 11.1 of the JVDA is not being used in the term-of-art sense described above. Any argument to the contrary is simply too clever by half.

---

(emphasis added).

12

The first prong of the *JA Apparel* test requires the court to examine "the entire contract" and "consider the relation of the parties and the circumstances under which it was executed."

In this case, plaintiff and defendant were joint venturers—partners in a business venture, who owed each other the same duty of highest loyalty that the law imposes on partners. *Argilus, LLC v. PNC Financial Services Group, Inc.*, 419 F. App'x 115, 119 (2d Cir. 2011). They had decided to end their joint venture. The contract was drafted to accomplish that objective. It was, in essence, a business divorce decree.

One party—SBBI—was going to continue to operate the business that had theretofore been jointly operated; it contracted to purchase the assets of the business, including its goodwill, in exchange for $15,000 and future commission payments flowing from an irrevocable license to HOM. The other party—HOM—agreed to sell its stake in the business for that sum. It also took an irrevocable license that permitted it to promote and sell SBBI's product, and to use SBBI's trademarks for that purpose, for a period of three years. The parties agreed to a commission payment scheme whereby HOM would receive 100% commissions on sales made on HOM's affiliate link during the first two years, and then 75% commissions for the third and final year. SBBI agreed to provide HOM with a link and certain technical assistance to facilitate its ability to sell the licensed product.

That is the context for Section 11, which the parties inserted into their "divorce decree."

Section 11.1 is a provision entitled "Non-Competition." Non-competition agreements lasting for a reasonable period are standard in joint venture dissolutions of this sort, particularly where, as here, one party is selling his interest in the goodwill of a jointly-operated business. *See, e.g., Capri Nail Corp. v. Iris Nail Corp.*, 13 A.D.3d 129, 129 (N.Y. App. Div. 1st Dep't 2004) (affirming entry of an injunction where, "inasmuch as defendants' claim is based on the

sale of a business and accompanying goodwill, the violation of the non-compete provision establishes irreparable harm . . . without the necessity of showing actual loss of clientele"). HOM points out that Section 12.1 of the JVDA insists that the subject headings of the paragraphs "are included for convenience only and do not affect the construction or interpretation of any of its provisions," but the conveniently-inserted word "Non-competition" gives a great deal of "context" to the words that follow. After all, the parties did not choose to call Section 11 of their JVDA "Zebras" or Xylophones," although those words would have been just as effective in setting off Section 11 from the Section 10 that immediately preceded it; Instead, they gave Section 11 a generally descriptive title. Nothing in Section 12.1 of the JVDA requires this Court to pretend otherwise.

Pursuant to Section 11.1, HOM agreed to a particular form of non-competition: it agreed that it would not become "involved," directly or indirectly, in any "business venture" that offered "products"—including "e-books" and other "works of authorship" (a broad phrase that would surely include e-seminars)—that contained "legal advice." Interpreting '[p]articular words . . . not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby,'" *JA Apparel*, 568 F.3d at 405, the phrase "containing legal advice" as used in the parties' "non-competition" clause could not possibly mean "legal advice" as used in the term of art sense. "Products" or "goods," "e-books" and "works of authorship" that are made available to the general public cannot contain "legal advice" in that sense—only persons who are licensed to practice law can do that, and only in the context of an attorney-client relationship. A commercial "product" that contained "legal advice" in the term of art sense would reprint the advice that particular lawyers gave to particular clients in the context of a particular problem—which would not only be of little practical use to the

14

general public, but would destroy the attorney-client privilege that would otherwise attach to said advice. That cannot possibly be what the parties meant.

The second prong of the *JA Apparel* test requires the court to impose a construction that is reasonable and fair. And the parties specifically adopted a rule of construction that required terms to be interpreted in a manner that would be "fair to both parties." Both *JA Apparel* and Section 12.1 of the JVDA would be violated by concluding that "legal advice" should be read in its term of art sense.

It would be entirely unreasonable to construe the JVDA using the term of art interpretation HOM proposes. HOM's crabbed definition of "legal advice" is not only nonsensical, it also ignores the relationship between the parties, the circumstances under which they entered into their agreement as reflected within the four corners of that agreement, and the obligations they were undertaking—including specifically the non-competition obligation undertaken by HOM in Section 11.1. If either SBBI or HOM, the parties to the JVDA, were to offer products containing "legal advice" of the particularized sort contemplated by HOM and the cases and ethics opinions cited above, the corporations would be violating Section 478 of the New York Judiciary Law—that is, they would be committing a crime. And if the attorneys who write the sections of the e-books and teach the e-seminars that acquaint small business people with the types of legal issues that they will encounter were deemed to be giving "legal advice" as the term is used in the cited authorities, those lawyers would be violating their ethical duty, since they would be giving "legal advice" to unrepresented parties (their customers).

The term of art interpretation proposed by HOM would be entirely unfair as well. SBBI made a bargain in which it (1) acquired HOM's interest in their jointly-owned business and its good will, while (2) providing both HOM *and itself* with the prospect of an income stream from

15

that business for a period of three years. It would make no sense—it would deprive SBBI of the benefit of that bargain—if HOM, having accepted compensation for its share of the joint venture, could simply turn its back on the license that entitled it to sell what was now SBBI's product for three years—thereby giving income to both parties—and go into direct competition with its former business partner, keeping all the income from that competing product for itself. That would be the necessary consequence of interpreting the phrase "legal advice" in the crabbed manner advanced by HOM. Such a construction would not be "fair to both parties."

Finally, adopting HOM's proposed definition would violate the third prong of the JA Apparel test, because it would leave section 11.1 without any force and effect. The products and goods marketed by SBBI and HOM, the parties to the JVDA, cannot contain "legal advice" in the sense propounded by HOM, because those entities are not licensed to practice law and, as corporations, cannot be licensed to practice law. Indeed, it is clear from *Dacey* that selling products of the sort that both SBBI and HOM are marketing—products containing general information about legal topics pertinent to a particular audience, offered for educational as opposed to representational purposes—does not constitute the unauthorized practice of law. Interpreting "legal advice" in the term of art sense would nullify Section 11.1, because HOM would be promising to do something that (1) it cannot legally do in any event, and (2) would not be in competition with its former partner. Put otherwise, HOM Its promise not to compete with its former partner for three years would be a promise to do nothing at all. Thus, SBBI—and the joint venture before it——have never engaged in offering products to the public that "contain legal advice."

All this necessarily means that "legal advice" as used in the JVDA cannot possibly be construed as meaning what the Second Circuit defined "legal advice" to be in *In re County of*

16

*Erie*—the "the interpretation and application of legal principles to guide future conduct or to assess past conduct," as rendered by one license to practice law acting in his capacity as lawyer. 473 F.3d at 419. So I must perforce reject HOM's invitation to conclude that "legal advice" as used in Section 11.1 of the JVDA means the same thing that "legal advice" means in the entirely different context of attorney-client privilege, attorney ethics and the unauthorized practice of law. I conclude that, in the entirely different context of an agreement dissolving a business partnership between two entities, neither of which is capable of giving "legal advice" in the term of art sense, it must mean something else.

Does that mean the term is ambiguous?

It does not.

I conclude that the term "legal advice" as used in Section 11.1 refers to the kind of general information about legal matters confronting small business that SBBI routinely offered to its clients during the period when the parties were invested in their joint venture—which is, of course, the only kind of "legal advice" that a business venture like SBBI or HOM is legally able to peddle to the public.

That interpretation meets all three prongs of the *JA Apparel* test. It is a fair and reasonable construction of the term when viewed in the context of the contract as a whole and the relationship of the parties and the obligations they were undertaking. It gives effect to every clause in the agreement. And because it is "fair to both parties," it comports with the parties' own chosen maxim of contract construction.

As I understand it, the joint venture that was being dissolved provided all sorts of information to small businesses about issues they would confront: business formation, contract drafting, drafting website content such as privacy policies, terms and conditions, and

disclaimers, protecting intellectual property, tax liability, and other ways in which a small business owner can avoid liability. Legal issues are one class of such issues. SBBI's products contained general information of legal issues—sample forms of contracts, for example—that "advised" small business generally about "legal" matters, without forming any sort of attorney-client relationship or addressing any particularized situation facing any particular small business. In Section 11.1, HOM agreed not to compete with SBBI for a three year period, to the limited extent of not affiliating itself with a business that gave the sort of "legal advice" the joint venture had given and that SBBI intended to continue to give. Significantly, HOM did not agree that it would not affiliate itself with a business venture that offered other types of advice and information to small businesses, such as information about business strategy, business accounting, insurance coverage or office management. Only affiliation with a business venture that created products containing advice about "legal" matters was prohibited.[6] The interpretation given to this phrase by the Court is consistent with the relationship of the parties, the overall context of the contract and the specific undertakings they have made to one another. It is far more reasonable and far fairer to both parties than the interpretation advances by HOM. It is fair to *both* parties, because it is the only plausible interpretation that gives each party the full benefit of its bargain: SBBI gets to continue to build its business and trade on whatever goodwill it acquired from HOM for a finite period without having to fend off competition from its former

---

[6] Indeed, HOM sought reconsideration of the TRO in part on the ground that it was overbroad, in that much of the material it intended to present in its Sentences & Money e-seminar was not about "legal" matters. That would not necessarily have been appropriate: Section 11.1 bars HOM from affiliating itself with any business venture that offers products and goods containing legal advice, and the allegation in the complaint, amply supported in the admittedly incomplete record so far developed, is that HOM's new business venture offers such products and goods. Whether unoffending portions of those products can be segregated and offered separately remains to be seen. The record on this point will be fully developed in the context of the preliminary injunction hearing to be held on March 30, 2015.

partner; HOM gets paid a sum it was willing to accept for selling its interest in that business; and both parties profit whenever HOM exercises its right as licensee to sell SBBI's product. And it does not turn the non-competition provision of the JVDA into an empty and meaningless promise.

Would it have been more prudent for SBBI to insist that the phrase "legal advice," which lent itself to a term of art understanding, be eschewed in favor of, say, "legal information?" Undoubtedly. With the benefit of hindsight one could wish it had done so.

But that does not alter the obvious: the term "legal advice" as used in Section 11.1 is unambiguous under the *JA Apparel* test. It encompasses the sort of general information about legal principles that the *Dacey* and *Winder* courts held harmless. Indeed, the esteemed legal ethicist Professor Stephen Gillers described *Dacey*'s rule in an article using the same sense of "legal advice" the contract does: *Dacey* "allowed people to publish books containing *legal advice* so long as they didn't actually counsel the purchasers of the book." Stephen Gillers, "The Year: 2075; the Product: Law," 1 J. Inst. for Study Legal Ethics 285, 288 (1996).

Because the term is unambiguous, the court will not hear parol evidence on its meaning. The only issues to be addressed at the hearing are (1) is SBBI likely to succeed on the merits of its contention that the product that HOM has recently begun offering violates Section 11.1 by providing "legal advice" as the term has been construed by the court; and (2) are the other conditions for entry of a preliminary injunction met?

This constitutes the decision and order of the Court.


Dated: March 20, 2015

19

U.S.D.J.

BY ECF TO ALL COUNSEL