UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————————— x

SMALL BUSINESS BODYGUARD INC.,

      Plaintiff/Counterclaim Defendant,

    -against-

HOUSE OF MOXIE, INC.,

      Defendant/Counterclaim Plaintiff,

    -against-

RACHEL RODGERS LAW OFFICE, PC *et al.*,

      Additional Counterclaim Defendants.
—————————————————————————— x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 1/31/17

No. 14-cv-7170 (CM)

## DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF AND COUNTERCLAIM DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

McMahon, C.J.:

Plaintiff/Counterclaim Defendant Small Business Bodyguard Inc. ("SBBI") brought this action against Defendant/Counterclaim Plaintiff House of Moxie, Inc. ("HOM"), which then brought counterclaims against SBBI, SBBI's CEO Rachel Rodgers ("Rodgers"), and Rodgers' law firm, Rachel Rodgers Law Office, PC ("RRLO").

Before the Court are HOM's motion for summary judgment (Dkt. No. 110) and SBBI, Rodgers, and RRLO's cross-motion for summary judgment (Dkt. No. 120).

As discussed below, both motions are GRANTED IN PART and DENIED IN PART.

## Factual Background

### I.    Establishment of the Joint Venture

This case arises from a short-lived joint venture between HOM, owned by Ashley Ambirge ("Ambirge"), and a consulting entity owned by Rodgers, Rachel Rodgers Consulting LLC ("RRC," now SBBI), to sell an e-book called "Small Business Bodyguard" (the "SBB Product"), along with related instructional videos, audio lessons, and related products and services. (PSUF ¶¶ 3-4.)[1]

HOM provides "strategic copyrighting advice and brand development services" and maintains an active online presence and an email list of over 20,000 small business owners. (DSUF ¶¶ 1-3.) Rodgers, in addition to founding the consulting entity RRC that later became SBBI, is an attorney, and practices intellectual property law under the firm name RRLO. (PSUF ¶ 2; PCSUF ¶¶ 5-6.) In February 2013, HOM signed a one-year engagement agreement with RRLO that provided that RRLO would represent HOM as its general business counsel. (DSUF Ex. 8.)

During the one-year term, RRLO performed various legal services for HOM, including the preparation of various corporate documents, tax filings, and trademark applications. (DSUF ¶ 8.) HOM decided not to continue the attorney-client relationship after the expiration of the one-year engagement agreement, which terminated on February 20, 2014. (*Id.* ¶ 9.)

---

[1] References to SBBI, Rodgers, and RRLO's Statement of Undisputed Material Facts (Dkt. No. 125) are designated "PSUF," references to SBBI, Rodgers, and RRLO's Counter-Statement of Undisputed Material Facts (Dkt. No. 124) are designated "PCSUF," references to HOM's Statement of Undisputed Material Facts (Dkt. No. 112) are designated "DSUF," and references to HOM's Counter-Statement of Undisputed Material Facts (Dkt. No. 128) are designated "DCSUF."

About three months into the attorney-client relationship, Ambirge and Rodgers decided to form a joint venture to develop a new e-book for small businesses. HOM and RRC entered into a joint venture agreement (the "JVA") in May 2013 to develop the SBB Product, which was sold online via the website www.smallbusinessbodyguard.com (the "SBB Website"). (PSUF ¶¶ 4-5; Bukher Decl. Ex. B ("JVA").) The agreement provided that the profits of the joint venture would be divided equally between RRC and HOM, and paid on a monthly basis. (JVA § 4.1.)

## II.     Dissolution of the Joint Venture

Less than a year after forming the joint venture, the parties began to have difficulties working together and ultimately decided to terminate the JVA.

HOM accused Rodgers of "mishandling" joint venture assets as the parties were discussing dissolution – namely, by withholding two monthly payments from HOM and by compensating RRC for its expenses but failing to do the same for HOM. (*See* PCSUF ¶¶ 22-23; DSUF ¶¶ 24-26.) However, the JVA did not set any deadline for distribution of the payments and HOM has presented no evidence that it was ever denied reimbursement for any of its expenses. (JVA §§ 4.1, 4.2; PCSUF ¶¶ 22-26.)

HOM also accused Rodgers of making misrepresentations regarding the joint venture's intellectual property.

First, when Rodgers sought to register the trademark "Small Business Bodyguard" with the U.S. Patent and Trademark Office ("PTO") in July 2013, Rodgers represented that the name had been used by the joint venture in commerce since as early as June 21, 2013. (DSUF ¶¶ 27-31.) HOM claims that this representation was false because the SBB Product was not sold to customers until July 24, 2013. (*Id.* ¶ 32.)

3

Second, HOM argues that RRC later falsely informed the PTO that a trademark assignment was pending before the parties formally agreed to dissolve the joint venture. (*Id.* ¶¶ 37-43.)

Third, although the original copyright registration application filed by Rodgers for the Small Business Bodyguard text and radio episodes listed Rodgers and Ambirge as co-authors, the copyright registration that was issued on October 17, 2014, Reg. No. SR 749-243 (the "SR Registration"), listed Rodgers as the sole author. (PSUF ¶¶ 78-81; PCSUF ¶¶ 45-47.) SBBI later filed a supplemental registration in December 2014 to correct this error and has taken other measures to correct it. (PSUF ¶¶ 81-83.) HOM filed a separate copyright registration application for the same Small Business Bodyguard text, again listing Ambirge and Rodgers as co-authors, and later assigned that registration (TX 7-907-164, the "TX Registration") and related registrations (TXu 190-8051 and TXu 190-8648, the "TXu Registrations") to SBBI. (PCSUF ¶¶ 55-59; *see* DSUF Ex. 84.)

The parties signed a joint-venture dissolution agreement (the "JVDA") on June 7, 2014. (PSUF ¶ 10; *see* Bukher Decl. Ex. A ("JVDA").) RRC's successor-in-interest SBBI agreed to purchase HOM's interest in the joint venture in exchange for (1) granting HOM an irrevocable license to sell the SBB Product (and updated versions of the SBB Product) for three years and (2) $15,000, to be paid in three $5,000 installment payments on June 30, July 30, and August 30, 2014. (PSUF ¶¶ 7, 15; JVDA § 2.1.)

The JVDA provided that the license granted to HOM to sell the SBB Product would be effectuated through a special hyperlink created by SBBI that would track the number of sales generated by HOM for purposes of calculating HOM's commission. (PSUF ¶¶ 13, 15; JVDA § 3.4.) HOM would receive a commission equal to 100% of the Gross Sales Price for the first

4

two years of the license, and then 75% of the Gross Sales Price in the third and final year of the license. (JVDA § 3.7.) "Gross Sales Price" is defined in the JVDA as the "full retail price charged by RRC to consumers." (*Id.*) HOM was also granted the right to periodically request from SBBI a "verifiable description of the referral partner settings" used to track HOM's sales, as well as a report calculating HOM's commissions. (*Id.* §§ 3.6, 3.9.)

The JVDA prohibited HOM from distributing or reproducing the SBB Product, from preparing derivative works based on the SBB Product, and from publicly speaking or writing in a manner that would "diminish or tarnish" the SBB Product's brand. (*Id.* §§ 3.1.1, 3.1.2.) HOM was also restricted to using only the current versions of SBBI's promotional materials. (*Id.* § 3.2.) The parties also mutually agreed "to refrain from making any public defamatory or inflammatory statements or comments regarding the other party, or any of the party's officers, directors, employees, personnel, agents, policies, services or products." (*Id.* § 10.1.)

An earlier draft of the JVDA apparently included a requirement that SBBI "not discontinue or cease selling" the SBB Product during the three-year term of the agreement, but the parties struck that sentence from the executed version. (*Id.* § 3.5.) After the end of the JVDA's three-year term, HOM had the option of signing on as an SBB affiliate if it wished to continue selling the SBB Product. (*Id.* § 5.3.)

## III.   The Parties' Performances Under the JVDA

After execution of the JVDA, accusations of breach came swiftly from both HOM and SBBI.

Almost immediately, HOM asserted that SBBI was in breach of the JVDA because it failed to provide HOM with a working affiliate hyperlink with which to sell the SBB Product. However, whatever problem may have existed with the link was quickly fixed. Ambirge herself testified that the link was functioning within three days (Ambirge Dep. at 161:3-163:16), and the

5

link was apparently working well enough that HOM was able to sell $10,127 worth of the SBB Product during June 2014, the first month of HOM's license. (*See* Order Den. Prelim. Inj. at 12-13, Dkt. No. 99.)

A few weeks after the JVDA was signed, Rodgers changed the licensee link through which HOM's sales were tracked so that the link "expired" after 30 days (rather than the original 90 days), while other affiliates of SBBI had 60-day tracking periods. (PCSUF ¶ 84.) It is unclear from the record why this change was made, but it apparently had little or no effect on HOM's ability to generate sales using the link or on SBBI's ability to calculate HOM's commission payments in the following months. SBBI also apparently failed to provide HOM with verification of its sales tracking settings in response to HOM requests, as required by the JVDA, although it did give HOM access to a website called the "Affiliate Center" which allowed HOM to see its generated sales in real time. (*Id.* ¶¶ 85-86; *see* JVDA § 3.6.)

Next, HOM's first commission payment, for June 2014 sales, was delayed by approximately one month due to cash-flow issues at SBBI. HOM ultimately accepted the late payment. (PSUF ¶¶ 29, 35-36.)

SBBI then announced a "last chance" promotion of the SBB Product, after which the price would increase from $295 to $495. (PCSUF ¶ 82.) SBBI apparently failed to inform Ambirge or HOM about this planned promotion (either before it was announced or after). Nonetheless, when Ambirge found out about it, she sent an email to her list of potential customers and told them to take advantage of the promotion, and added that Rodgers would be taking over the whole SBB Product business. (*Id.* ¶¶ 82-83.)

HOM also asserts that SBBI improperly calculated some of the commissions it was owed – specifically, it withheld $470 in "finance fees" collected from customers who sought to pay for

6

the SBBI Product in installments. Under the installment plan, customers would pay for the SBB Product with two $277 payments instead of a single $495 payment, resulting in $59 in additional revenue. SBBI disagrees that this $59 finance fee constitutes part of the "Gross Sales Price" used to calculate HOM's commissions under the JVDA.

Starting in late September 2014, SBBI began to implement a new marketing strategy that would make the SBB Product available only for limited timeframes, which would be preceded by periods of heavy promotion and followed by periods where the SBB Product would be unavailable for purchase. (PSUF ¶ 122.) On September 26 and October 9, 2014, SBBI issued promotional emails stating that "access" to the SBB Product would soon "close." (PCSUF ¶¶ 108-109.) Visitors to the SBB Website who attempted to purchase the SBB Product after the limited sales period would be informed that they "missed the opportunity to purchase Small Business Bodyguard," but that they could join the SBBI mailing list to be informed when the product was next available for purchase. (*Id.* ¶¶ 110-111.)

In November 2014, SBBI launched an update to the SBB Product, called "Small Business Bodyguard+." (*Id.* ¶¶ 115-121.) Ambirge was not listed as a joint author of Small Business Bodyguard+. It appears from the record that Ambirge had asked, through an email from her attorney on June 20, 2014, to have her name removed from SBBI's promotional emails to customers. (*See* 2d Koustenis Decl. Ex. 24 at 3.) The email did not specifically request that her name be removed as a co-author of the SBB Product. (*Id.*) Rodgers testified that Ambirge and her attorneys asked her multiple times over the phone to remove Ambirge's name from the SBB Product as a co-author, and that Rodgers was initially reluctant to do so but ultimately acceded to Ambirge's request. (*See* DSUF Ex. 164 at 163:9-165:16.) HOM has presented no evidence contradicting this testimony.

7

Based on what it perceived as "material breaches" of the JVDA, HOM attempted to rescind the JVDA and launch its own website to sell the SBB Product. (PCSUF ¶ 96.) On August 19, 2014, HOM launched the sales website http://smallbusinessbodyguardonline.com (the "HOM SBB Website"), which was an exact copy of the then-existing SBB Website, replete with excerpts of the SBB Product and SBBI's promotional materials. (PCSUF ¶ 96; PSUF ¶ 41.)

Within hours, Rodgers sent a Digital Millennium Copyright Act ("DMCA") takedown notice to BlueHost, the web hosting provider for the HOM SBB Website. (PCSUF ¶ 99.) On August 21, 2014, BlueHost informed HOM that its entire account – not just the HOM SBB Website, but also HOM's other websites – had been deactivated due to a copyright violation. (Id. ¶ 100.) HOM sent counter-notices to BlueHost, and SBBI ultimately filed this lawsuit. (Id. ¶¶ 101-102.) HOM argues that many of the deactivated sites contained no SBB-related content and that it incurred $5,936 in costs to move the unrelated websites to a new hosting vendor. (Id. ¶¶ 103-106.)

SBBI also argues that HOM defamed SBBI and Rodgers in the lead up to this litigation. HOM posted two articles in October 2014 on its website *The Middle Finger Project* and made one post on Facebook that SBBI asserts are libelous. Ambirge also communicated via email with a third party, Scott Greenfield, to discuss an article Greenfield had published online titled *Rachel Rodgers: Anything For A Quick Buck?*, which paints an unflattering portrait of Rodgers. (*See* DSUF Ex. 188; DSUF Ex. 189.)

Finally, in March 2015, after this litigation had commenced, HOM launched a new website, www.sentencesandmoney.com, to promote its new product, Sentences and Money, a four-week course on business writing. (PSUF ¶¶ 64-65.) SBBI immediately sought to enjoin HOM from offering the course on the grounds that the JVDA prohibited HOM from becoming

8

involved in "a business that provides legal services, or sells products or goods . . . that contain legal advice." (JVDA § 11.1.) This Court permitted HOM to alter the proposed course by removing the components that provided legal advice, and ultimately HOM offered the revised course. (*See* Dkt. No. 93; *see also* Order Den. Prelim. Inj. at 5-6.) HOM issued refunds to customers who did not wish to attend the course after the portions providing legal advice were deleted. (*See* Order Den. Prelim. Inj. at 11, 16; PSUF ¶ 68; DCSUF ¶ 68.)

## IV.   HOM's Counterclaims

In addition to asserting that SBBI interfered with its ability to sell the SBB Product in violation of the JVDA's licensing provisions, HOM asserts counterclaims against Rodgers and Rodgers' law office RRLO for legal malpractice and breach of fiduciary duty.

First, HOM asserts that Rodgers failed to file the proper S-corporation election form with the IRS on HOM's behalf, making HOM a C-corporation. This resulted in $40,000 in potential additional taxes that HOM was only able to avoid through payment of a $195 late fee to the IRS and additional legal fees. Rodgers disputes these allegations and, after the close of discovery, produced a fax confirmation that shows the S-corporation election form being submitted to the IRS on June 4, 2013. (*See* Bukher Decl. Ex. S.)

Second, HOM asserts that Rodgers committed malpractice relating to a June 24, 2013 trademark application Rodgers submitted on behalf of another HOM website, *The Middle Finger Project*. (DSUF ¶ 65.) The PTO issued a substantive office action on December 30, 2013, denying the registration because the mark "consists of or includes immoral or scandalous matter," in violation of Section 2(a) of the Trademark Act. (*Id.* ¶ 66.) Rodgers did not inform HOM about the office action until after the attorney-client relationship terminated in February 2014. (PCSUF ¶ 67; Rodgers Decl. ¶ 80.) HOM did eventually obtain its trademark registration for *The Middle Finger Project*; the deadline for responding to the office action was not until June

9

30, 2014 and HOM timely submitted a response to the PTO that ultimately proved persuasive. (PSUF ¶ 116.)

Third, HOM asserts that Rodgers' previously-discussed "misrepresentations" to the PTO regarding the joint venture's "Small Business Bodyguard" mark jeopardized the joint venture's intellectual property rights and separately constitutes malpractice.

Finally, HOM asserts that Rodgers acted improperly by serving as counsel for HOM when the parties signed the JVA. It appears that Rodgers neither encouraged nor discouraged HOM to seek separate counsel when the parties were forming the joint venture, although whether she raised the issue at all is disputed. (Rodgers Decl. ¶ 55; PCSUF ¶ 17; DCSUF ¶ 94.) HOM eventually retained separate counsel when the parties drafted the JVDA. (DCSUF ¶ 95.) HOM does not identify any specific JVA provisions that it asserts were improper due to this apparent conflict of interest, nor does it seek rescission of the JVA. It also appears that a nearly identical agreement drafted by Rodgers for another of HOM's joint ventures has been satisfactory to HOM. (PSUF ¶ 96-103.)

## Procedural History

Rather than recite the full history of this litigation (during which claims and counterclaims have been added, dismissed, and re-added), I will focus only on the claims that remain.

SBBI's amended complaint (Dkt. No. 96) asserts nine counts against HOM: (1) breach of contract for violating the JVDA by establishing the HOM SBB Website; (2) breach of contract for making statements about Rodgers and SBBI in violation of the JVDA; (3) breach of contract for offering the Sentences and Money curriculum in violation of the JVDA; (4) unjust enrichment through sales of the SBB Product (in the event the JVDA is rescinded); (5) infringement of the SR Registration through operation of the HOM SBB Website;

10

(6) infringement of the TX Registration through operation of the HOM SBB Website;

(7) common-law defamation against SBBI and Rodgers; (8) seeking declaratory judgment that

HOM has no rights in the TXu Registrations previously assigned to SBBI; and (9) common-law

unfair competition for HOM's creation of the HOM SBB Website.

HOM asserted eight counterclaims against SBBI, Rodgers, and RRLO in its answer to the

amended complaint (Dkt. No. 106): (1) breach of contract against SBBI for interfering with the

licensing provisions of the JVDA; (2) breach of contract against SBBI for failure to turn over

revenues as required by the JVDA; (3) breach of contract against SBBI for failing to engage in

business discussions with HOM; (4) unjust enrichment against SBBI; (5) breach of fiduciary

duty against Rodgers and RRLO regarding formation of the joint venture; (6) breach of fiduciary

duty against SBBI, Rodgers, and RRLO for the delayed payments and alleged mishandling of the

joint venture's assets and intellectual property; (7) legal malpractice against Rodgers and RRLO

for the services provided to HOM; and (8) legal malpractice against Rodgers and RRLO for the

services provided related to the joint venture.

HOM has moved for summary judgment dismissing all of SBBI's claims and for

judgment in its favor on its own first, second, fifth, sixth, seventh, and eighth counterclaims.

(Dkt. No. 110.) Rodgers, RRLO, and SBBI have cross-moved for summary judgment in SBBI's

favor all of SBBI's claims against HOM, and for summary judgment dismissing HOM's first,

second, fifth, sixth, seventh, and eighth counterclaims. (Dkt. No. 120.)

SBBI previously moved for a temporary restraining order ("TRO") and a preliminary

injunction to halt HOM's offering of the Sentences and Money course. (*See* Dkt. Nos. 64-66.)

The Court granted the TRO (Dkt. No. 67), but later permitted HOM to offer a revised course

after the parties agreed that HOM had removed the elements that violated the JVDA (Dkt. No.

11

93). The Court ultimately denied the motion for a preliminary injunction because (1) SBBI could not show a likelihood of irreparable injury (only damages), and (2) HOM never actually offered the original, offending course. (Dkt. No. 99.)

## Applicable Legal Standard

Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-50 (1986). The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A dispute concerning material fact is genuine "if evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir. 1992) (quoting *Anderson*, 477 U.S. at 248). A genuine issue for trial exists if, based on the record as a whole, a reasonable jury could find in favor of the non-movant. *See Anderson*, 477 U.S. at 248. In making its determination, the Court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *See id.* at 255.

To defeat summary judgment, it is not sufficient for the non-moving party to present evidence that is conclusory or speculative, with no basis in fact. *See Anderson*, 477 U.S. at 249-50. Instead, the non-moving party must go beyond the pleadings and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the nonmoving party must present "specific facts showing that there is a genuine issue for trial." *Beard v. Banks*, 548 U.S. 521, 529 (2006). "Summary judgment is designed . . . to flush out those cases that are predestined to result in directed verdict." *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 907 (2d Cir. 1997).

12

## Discussion

I.     **SBBI's Claims Arising from the HOM SBB Website (Counts 1, 5, 6, and 9)**

      A.     **Count 1: HOM's Motion for Summary Judgment Dismissing SBBI's Breach-of-Contract Claim Is Granted; SBBI's Cross-Motion for Summary Judgment in Its Favor Is Denied**

Count 1 asserts that HOM violated the JVDA by launching the HOM SBB Website (which was designed to appear identical to the SBB Website operated by SBBI) and effectuating at least one sale of the SBB Product through that website.

Under New York law, the elements of a breach-of-contract claim are: (1) the existence of a valid contract between the parties; (2) performance by the party alleging breach; (3) failure of the breaching party to perform; and (4) damages attributable to the breach. *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 142 (2d Cir. 2011) (citing *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004)).

Neither party disputes that the JVDA is a valid contract, satisfying the first element.[2] HOM disputes the second and third elements: whether SBBI materially performed, and whether it (HOM) breached the JVDA. But the Court need not address those arguments, because SBBI has offered no evidence that HOM's creation of the HOM SBB Website resulted in any actual damages to SBBI, and thus has failed to raise a genuine issue of material fact on the fourth element of its claim.

The unrebutted evidence shows that the HOM SBB Website was in operation for only a few days, effectuating only one $495 sale of the SBB Product, on August 19, 2014. (DSUF Ex. 138; PCSUF ¶¶ 96-100.) There is no dispute that $495 was the then-current sales price of the

---

[2] Because of this, Count 4 – SBBI's claim for unjust enrichment (asserted in the alterative to its first three claims in the event the Court held the JVDA was invalid) – is dismissed.

SBB Product, and that, under the JVDA, HOM would have been entitled to 100% of that amount as a commission for any sale it generated. (JVDA § 3.7.) SBBI cannot, therefore, establish that it suffered any actual damages as a result of HOM's brief operation of the HOM SBB Website.

SBBI's assertion (made for the first time in its reply brief) that it is entitled to additional damages to compensate for "the web traffic and exposure lost by the SBB Website, any loss of potential new subscribers to the SBBI mailing list, and injury to SBBI's image" is both untimely and unsupported by any evidence. (*See* Pl.'s Reply Mem. of Law at 1, Dkt. No. 132.) First, the Court is under no obligation to consider arguments raised for the first time in a reply brief. *Manon v. Pons*, 131 F. Supp. 3d 219, 238-39 (S.D.N.Y. 2015). Second, there is no absolutely no evidence in the record that SBBI suffered any such damages. SBBI simply argues that the precise amount of damages should be left for determination at trial (*see* Am. Compl. Prayer for Relief ¶¶ 3, 5, 6, 8), but that does not excuse its failure to demonstrate the existence of any damages at all.

On a motion for summary judgment, SBBI must offer actual evidence that it suffered damages, not mere speculation. In other words, a summary judgment motion is "put up or shut up" time for litigants. HOM is, therefore, entitled to summary judgment dismissing Count 1.

**B.    Count 5: HOM's Motion for Summary Judgment Dismissing SBBI's Copyright Infringement Claim Based on the SR Registration Is Denied; SBBI's Cross-Motion for Summary Judgment in Its Favor Is Granted**

Count 5 seeks statutory damages for the HOM SBB Website's infringement of the SR Registration, a registered copyright.

There are two elements to a copyright infringement claim: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Kwan v. Schlein*, 634 F.3d 224, 229 (2d Cir. 2011) (quoting *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)). A certificate of registration is *prima facie* evidence that a copyright is

14

valid. 17 U.S.C. § 410(c); *Rogers v. Koons*, 960 F.2d 301, 306 (2d Cir. 1992). The presumption

of validity may be rebutted, but an "innocent or inadvertent omission will not invalidate a

copyright registration." *Lida, Inc. v. Texollini, Inc.*, 768 F. Supp. 439, 442 (S.D.N.Y. 1991).

### 1. SBBI Owns a Valid Copyright in the Small Business Bodyguard Text

On July 25, 2013, Rodgers filed an application for a copyright registration in the SBB

Product (the Small Business Bodyguard e-book text), and in four episodes of Small Business

Bodyguard Radio, which were companion audio recordings to the SBB Product. The Copyright

Office issued the SR Registration on October 17, 2014, covering the SBB Product and the four

radio episodes. By operation of the JVDA, HOM assigned any interest it had in this copyright to

SBBI. (JVDA § 2.2.) As a duly registered copyright, the copyright covered by the SR

Registration is entitled to the presumption of validity.

HOM asserts that the SR Registration is actually invalid, because Rodgers, RRLO, and

SBBI made material misrepresentations to the Copyright Office concerning authorship of the

SBB Product during the copyright registration process.

The initial application for the SR Registration listed both Ambirge and Rodgers as co-

authors of the SBB Product. However, Ambirge's authorship was listed with a notation that her

contribution constituted a work made for hire. (DSUF Ex. 73; *see* Rodgers Dep. at 134:8-

137:25.) On an application for copyright registration, the "work made for hire" designation

indicates that the author listed in the application (and the holder of the copyright) was the

*employer* of the person who created the work at issue. *See generally* 1 Melville B. Nimmer &

David Nimmer, *Nimmer on Copyright* § 1.06[C]. The name of the *employee* who created the

work is generally not listed on the registration.

It appears from the correspondence from the Copyright Office in the record that the

Office interpreted the application filed by Rodgers as indicating that Ambirge and Rodgers were

co-creators of the work, but that Ambirge was Rodgers' employee.[3] As such, the certificate of

registration issued by the Copyright Office more than a year later listed only Rodgers as an

author, with the attribution for "editing" including a work-for-hire notation, to reflect its

erroneous understanding that Rodgers was the employer of the person (Ambirge) who edited the

work. (*See* Bukher Decl. Ex. M.)

Obviously, the SR Registration did not accurately reflect the relationship between

Rodgers and Ambirge. Therefore, on or around December 10, 2014, Rodgers filed a

supplementary registration form with the Copyright Office to correct the error and add Ambirge

back as a co-author. (*See* Bukher Decl. Ex. P.)

HOM's assertion that, "At some point" between filing the initial application in July 2013

and the registration's issuing in October 2014, SBBI, Rodgers, and RRLO "made material

misrepresentations to the Copyright Office that led the Office to issue the SR Registration with

Rachel Rodgers listed as the sole author" is unsupported by any evidence. The only evidence of

communications from Rodgers to the Copyright Office is the application itself, which lists

Ambirge as a co-author, albeit with the confusing (and, according to Rodgers' unrebutted

---

[3] For example, on May 23, 2014, a representative from the Copyright Office emailed Rodgers stating, in relevant part:

> Before we go ahead with your registration, we have a few questions to make sure we have the facts correct. First, the application names you and Ashley Ambirge as co-authors, and answers "no" to the work made for hire question for you and "yes" for Ms. Ambirge. Answering yes to this question means that the author named employed someone else to the create the contributions listed . . . , but it appears that Ms. Ambirge actually created the text and sound recording with you. Possibly the "yes" answer refers to other elements of the work, such as the photographs of you and Ms. Ambirge. Please let us know if any portion of this work was made for hire.

(Bukher Decl. Ex. N at 1.) There is no written response in the record from Rodgers (or anyone from her law office) to this email clarifying the work-made-for-hire issue.

testimony, unintentional) work-made-for-hire designation. The Copyright Office, not Rodgers,

failed to list Ambirge as a co-author on the registration certificate. Rodgers filed a supplementary

registration to correct the Copyright Office's mistake after the registration certificate issued. No

evidence in the record contradicts this version of events.

These circumstances do not suggest that Rodgers, SBBI, or RRLO made any attempt to

mislead the Copyright Office. The SR Registration is, therefore, a valid copyright registration,

making SBBI the owner of a valid copyright.[4]

### 2. HOM Infringed the SR Registration

On August 19, 2014, HOM launched the HOM SBB Website, which was an exact replica

of the then-current version of the SBB Website. (DCSUF ¶ 37.) The SBB Website, at that time,

included excerpts from the Small Business Bodyguard e-book covered by the SR Registration.

(PSUF ¶ 41; DCSUF ¶ 41.)

Ordinarily, this would end the inquiry, as HOM's reproduction of portions of the

copyrighted work presents an open-and-shut case of infringement. But HOM insists that its

license to sell the SBB Product included the right to use and reproduce the SBB Website's

materials, so it could not possibly have infringed SBBI's copyright. *See, e.g., Bourne v. Walt*

*Disney Co.*, 68 F.3d 621, 631 (2d Cir. 1995).

---

[4] HOM's additional argument that SBBI cannot maintain an action for infringement because the
SR Registration was issued after SBBI filed its initial complaint is incorrect. This Court
previously dismissed SBBI's copyright infringement claim without prejudice on these grounds.
(*See* Dkt. No. 34 at 6-7 (citing *Muench Photography, Inc. v. Houghton Mifflin Harcourt Pub.
Co.*, No. 09 Civ. 2669, 2012 WL 1021535, at *5 (S.D.N.Y. Mar. 26, 2012)).) However, SBBI
properly amended its complaint after the SR Registration was issued (*see* Dkt. No. 96), and
therefore satisfies the threshold requirement of ownership of a valid copyright. *See Pyatt v.
Raymond*, 462 F. App'x 22, 24 (2d Cir. 2012), *as amended* (Feb. 9, 2012); 6 William F. Patry,
*Patry on Copyright* § 19:4 (2016) ("Where plaintiff has received registrations subsequent to the
filing of the complaint, the complaint should be amended.").

While a valid license may serve as a defense to infringement, "the fact that a party has licensed certain rights to its copyright to another party does not prohibit the licensor from bringing an infringement action where it believes the license is exceeded or the agreement breached." *Tasini v. N.Y. Times Co.*, 206 F.3d 161, 170 (2d Cir. 2000), *aff'd*, 533 U.S. 483 (2001). In this case, the claim survives.

The relevant portion of the JVDA provides that: "HOM may not, within the meaning of the U.S. Copyright Act, distribute or reproduce the SBB Work, nor prepare derivative works based on the SBB Work. HOM agrees to use only the current versions of the Promotional Materials that [SBBI] provides or makes available to HOM under this Agreement." (JVDA § 3.1.1.) "Promotional Materials" is defined earlier in the agreement to mean "any advertising, marketing or promotional materials used in connection with the SBB Program (including without limitation, banner advertisements, button links, text links, graphic material or textual material)." (*Id.* § 2.2.)

The JVDA also states that "HOM may not reproduce any verbatim sections of the Work without [SBBI]'s prior express written approval." (*Id.* § 3.1.2.)

HOM's limited, non-exclusive license to sell the SBB Product and to use certain promotional materials did not give it the authority to reproduce portions of the copyrighted SBB Product on its website. SBBI provided its "Promotional Materials" to its affiliates via a different website called the "Affiliate Center," which included downloadable materials like banner advertisements and promotional text that affiliates could use on their own websites to promote the SBB Product. (*See, e.g.*, DSUF Ex. 155 at 2.) These types of promotional materials – banner advertisements, button links, and promotional textual material – are explicitly included in the JVDA's definition of "Promotional Materials." (JVDA § 2.2.) That definition does not include

18

portions of the copyrighted SBB Product. SBBI did not put portions of the copyrighted text on the Affiliate Center for affiliates to use as promotional material. (*See* Rodgers Dep. at 63:14-64:12.)

If the parties had intended the JVDA to give HOM the right to reproduce the copyrighted text of the SBB Product, it would make no sense to include multiple different provisions in the same contract that expressly *prohibited* HOM from reproducing any portion of the SBB Product without SBBI's prior written permission. (*See* JVDA §§ 3.1.1, 3.1.2.)

Although HOM had a valid license to sell the SBB Product, HOM "utilize[d] a copyrighted work in a manner or to an extent not authorized by the license agreement," making its position "no different from that of an infringer having no contractual relationship with the holder of the copyright." *Kanakos v. MX Trading Corp.*, No. 81 Civ. 4632, 1981 WL 1377, at \*2 (S.D.N.Y. Sept. 16, 1981). Therefore, "the resulting cause of action is one for copyright infringement," not merely breach of contract, "and the claim[] . . . arise[s] under the copyright statutes." *Id.*; *see also Marshall v. New Kids On The Block P'ship*, 780 F. Supp. 1005, 1009 (S.D.N.Y. 1991).

SBBI is, thus, entitled to statutory damages under the Copyright Act for HOM's infringement of the SR Registration. 17 U.S.C. § 504(c). The amount of statutory damages will be determined at trial.

C.   **Count 6: HOM's Motion for Summary Judgment Dismissing SBBI's Claim for Infringement of the TX Registration Is Granted; SBBI's Cross-Motion for Summary Judgment in Its Favor Is Denied**

Count 6 asserts that HOM infringed the TX Registration by briefly operating the HOM SBB Website.

The TX Registration was filed by HOM as an "adverse" registration on August 28, 2014, and covers only the SBB Product (the Small Business Bodyguard e-book), not the four audio

19

recordings. (*See* DSUF Ex. 81.) In September 2015, Ambirge recorded with the Copyright Office the assignment of the TX Registration to SBBI through operation of the JVDA.

There is no dispute about the validity of the TX Registration or the assignment of the registration to SBBI, and the registration protects the same content that HOM duplicated by creating the HOM SBB Website. However (and apparently unbeknownst to the parties), the Copyright Act provides that "no award of statutory damages or of attorney's fees," shall be made for "any infringement of copyright commenced after first publication of the work and before the effective date of its registration, unless such registration is made within three months after the first publication of the work." 17 U.S.C. § 412(2). The TX Registration was not made within three months after the first publication of the SBB Product, so statutory damages are not available for any infringement that commenced between July 24, 2013 (the date the SBB Product was first published) and August 28, 2014 (the effective date of the TX Registration). (*See* DSUF Ex. 81 at 1.)

This rule compels dismissal of Count 6. The HOM SBB Website was only in operation for a few days between August 19 and August 21, 2014. It was no longer operational by the time the TX Registration became effective on August 28, 2014. Therefore, as a matter of law, SBBI cannot be awarded statutory damages – the only damages here sought – for HOM's infringement of the TX Registration. HOM is, therefore, entitled to summary judgment dismissing this claim.

**D.      Count 9: HOM's Motion for Summary Judgment Dismissing SBBI's Claim for Unfair Competition Is Granted; SBBI's Cross-Motion for Summary Judgment in Its Favor Is Denied**

Count 9 asserts that HOM's creation of the HOM SBB Website constituted unfair competition under New York law.

Unfair competition under New York law generally mirrors liability under § 43(a) of the Lanham Act. SBBI's parallel Lanham Act claim was previously dismissed by the Court for

20

failure to allege any potential consumer confusion, as the product sold by HOM on its website was genuine and not marketed under another trademark. (*See* Dkt. No. 34 at 7-10.)

However, under New York law, unfair competition is a "broad and flexible doctrine" that is more fact-dependent than most causes of action. *Roy Exp. Co. Estab. v. Columbia Broad. Sys., Inc.*, 672 F.2d 1095, 1105 (2d Cir. 1982) (quoting *Metro. Opera Ass'n v. Wagner-Nichols Recorder Corp.*, 199 Misc. 786, 792 (N.Y. Cty. Sup. Ct. 1950), *aff'd*, 279 A.D. 632 (1st Dep't 1951)). For that reason, the unfair competition claim survived the motion to dismiss. It does not, however, survive the motion for summary judgment.

New York recognizes two species of common-law unfair competition: "palming off" (also called "passing off") and misappropriation. *See ITC Ltd. v. Punchgini, Inc.*, 9 N.Y.3d 467, 476 (2007). Palming off is the sale of goods created by one manufacturer as one of another, even if the parties are not in competition, while misappropriation is the misuse of the "results of the skill, expenditures and labors of a competitor." *See Electrolux Corp. v. Val-Worth, Inc.*, 6 N.Y.2d 556, 567-68 (1959). The essence of a misappropriation unfair competition claim under New York law "is that the defendant misappropriated the fruit of plaintiff's labors and expenditures by obtaining access to plaintiff's business idea either through fraud or deception, or an abuse of a fiduciary or confidential relationship." *Katz Dochrermann & Epstein, Inc. v. Home Box Office*, No. 97 Civ. 7763, 1999 WL 179603, at *4 (S.D.N.Y. Mar. 31, 1999).

SBBI has not offered any evidence that would support a claim under either theory. HOM did not "palm off" anything; the SBB Product it sold via the HOM SBB Website was the genuine article. There is also no viable claim of "reverse" palming off, as HOM did not attempt to sell the SBB Product under its own trademark. SBBI does not even attempt to articulate a

misappropriation claim in its briefs, nor does it point to any evidence that could support such a claim.

HOM is, therefore, entitled to summary judgment dismissing this count.

## II.   SBBI's Claims Arising from HOM's Statements (Counts 2 and 7)

After this litigation commenced, HOM made several public statements that, according to SBBI, both breached the JVDA (Count 2) and constituted common-law defamation (Count 7).

### A.   Count 2: HOM's Motion for Summary Judgment Dismissing SBBI's Breach-of-Contract Claim Is Granted; SBBI's Cross-Motion for Summary Judgment in Its Favor Is Denied

The JVDA provides that, during the three-year term of the agreement, the parties "agree to refrain from making any public defamatory or inflammatory statements or comments regarding the other party, or any of the other party's officers, directors, employees, personnel, agents, policies, services or products." (JVDA § 10.1.)

The JVDA's prohibition on making "defamatory" statements is judged under the same standards as common-law defamation. The New York Court of Appeals has defined defamation as "the making of a false statement which tends to expose the plaintiff to public contempt, ridicule, aversion or disgrace, or induce an evil opinion of [her] in the minds of right-thinking persons, and to deprive [her] of their friendly intercourse in society." *Foster v. Churchill*, 87 N.Y.2d 744, 751 (1996) (internal quotation marks omitted) (quoting *Rinaldi v. Holt, Rinehart & Winston, Inc.*, 42 N.Y.2d 369, 379 (1977)). There are seven elements of defamation under New York law: (1) a defamatory statement of fact; (2) that is false; (3) published to a third party; (4) "of and concerning" the plaintiff; (5) made with the applicable level of fault on the part of the speaker; (6) either causing harm or constituting slander *per se*; and (7) not protected by privilege. *Albert v. Loksen*, 239 F.3d 256, 265-66 (2d Cir. 2001). Because of the language of JVDA § 10.1, the "plaintiff" for the "of and concerning" element includes SBBI's "officers, directors,

employees, personnel, agents, policies, services or products" for purposes of this breach-of-contract claim.

The JVDA's separate prohibition on "inflammatory" statements does not have a common-law parallel. While the Court is unaware of any other breach-of-contract case based on a similar contract provision, I must nonetheless ascribe the "fair and reasonable meaning" to each contract term, and avoid interpretations that result in surplusage. *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 405 (2d Cir. 2009). Therefore, the Court must assume that the parties included the term "inflammatory" to mean something distinct from the separate prohibition on making defamatory statements.

SBBI argues that "inflammatory" is a "common, plain English word," and urges the Court to adopt the definition used by the Black's Law Dictionary: "Tending to cause strong feelings of anger, indignation, or other type of upset; tending to stir the passions." Black's Law Dictionary (10th ed. 2014). HOM counters that SBBI is attempting to establish a "self-proclaimed lower standard" than that used for defamation suits, but does not posit an alternative definition, so the Court applies the definition supplied by SBBI, which appears to be a fair and reasonable definition of "inflammatory."

There are three types of communications that SBBI argues violated the JVDA: (1) a single post on the social media platform Facebook; (2) Ambirge's two posts on her blog *The Middle Finger Project*; and (3) Ambirge's email exchange regarding this litigation with Scott Greenfield, author of his own online article about Rodgers.

### 1. HOM's Facebook Post Did Not Breach the JVDA

On October 24, 2014, HOM published a Facebook post that read: "UPDATE: ALL CLAIMS AGAINST HOUSE OF MOXIE OFFICIALLY DISMISSED!!!!!!!!!! ....and now we march forward with the claims of our own." (Bukher Decl. Ex. G.)

23

SBBI argues that, through this Facebook post, HOM "directed its users to its counterclaims, and engaged in public degradation of SBBI and Rachel Rodgers." (Pl.'s Mem. of Law at 8.) This argument only concerns the latter half of HOM's statement: "and now we march forward with the claims of our own." That statement is true, and therefore not defamatory. To the extent that this language "directed" readers to HOM's counterclaims (which it does not), that is not an assertion of fact capable of being proven true or false. The counterclaims themselves are absolutely privileged from defamation liability under New York law. *Lacher v. Engel*, 33 A.D.3d 10, 17 (1st Dep't 2006).

The Facebook post's reference to HOM's counterclaims is also not "inflammatory." There is no conceivable way that a comment directing people to publicly filed claims that are themselves privileged would be likely to make a reader (other than Rodgers herself) angry or upset, let alone strongly or passionately so.

To the extent that SBBI argues that the first half of the post – that "all claims" against HOM had been dismissed – is defamatory, that claim also fails. While HOM's statement is in fact false (not all of SBBI's claims were dismissed), the statement is not defamatory. It does not expose SBBI "to public contempt, ridicule, aversion or disgrace." *Foster*, 87 N.Y.2d at 751. Likewise, no reasonable reader would become "inflamed" by reading this statement.

In short, this Facebook post did not breach the JVDA.

Even assuming that this Facebook post were "defamatory" or "inflammatory," SBBI has not offered any evidence that it suffered any damages as a result. As discussed above in the context of Count 1, damages is an element of any breach-of-contract claim, *see Johnson*, 660 F.3d at 142, so in order to survive a motion for summary judgment, a non-movant must submit evidence that at least raises a genuine issue of fact regarding damages. SBBI does not do so.

24

SBBI asserts that it suffered "damage to its goodwill and reputation and through immediate loss of subscribers to the Brand and Product, in an amount to be determined at trial, and in no event less than $75,000.00" as a result of HOM's Facebook post and other statements. (Am. Compl. ¶ 68). To support this claim, it has produced three annual profit and loss statements from 2013, 2014, and 2015. These show that revenues from the SBB Product decreased in 2015 as compared to earlier years (but increased from 2013 to 2014, during the time that the statements at issue were made). (*See* Bukher Decl. Ex. K.)

But for this to fly, SBBI must link the decline in revenue to HOM's post. To do so, SBBI has produced four emails from disgruntled customers. (*See* Bukher Decl. Ex. L.) The first three emails were sent on October 17 and 18, before HOM's Facebook post on October 24, so obviously they prove nothing of the sort. (*See id.* at 1, 2, and 4.)

The only email that was sent after the post, sent on December 4, 2014 (seven weeks after the post), also does not support SBBI's argument:

Rachel,

I'd like a refund. I'm really disgusted by this entire transaction. Many number of things irk me about the money I've spent, the first of the long list being your advertising directly to me using a brand/name that I associate with trust. Ms. Ambirge worked very hard to earn my trust over the months prior to my purchase on or about 9/26 of this year—and I've spent a good deal of money on her content. It was worth it and it was marketed in black and white. It's my understanding from the public court records I've recently read relating to your venture with her that she wasn't at all in control of where her name was being pushed and used to gain my trust and therefore my MONEY at the time I was finally convinced by your inbox solicitations (which I subscribed to) that I should just go ahead and press that buy-it button. Since gaining access to the member site, you have reduced the content and stripped it down to near nothing (nothing but the bare bones basics, living in the grey area that is "can't pin you down" land) while selling and promoting SBBG+ which boasts oh, so much more. I've also read the opinions and reviews about SBBG written by attorneys from a variety of states . . . and I'm grossed out.

This is slimy and I've lost all confidence in this product. CMA? I'm doubting I've

25

even begun to cover my rear and what's more, I feel baited & switched, punked and fooled by this whole product because of my belief that you are violating ethics in spades at many proverbial card tables. That's my belief.

I really don't want to believe that all lawyers are slimy. I have a fine [one] on retainer right now to me CMA the good old fashioned way—with honesty and straight up, no smartypants, smartass, 80 shades of shady grey results.

So, really, I'd like a full refund, if you please. And if I'm asked about this whole thing, I'd like to be able to say I felt you did the right thing in the end where I'm personally concerned.

I look forward to hearing from you.

[. . .]

(*Id.* at 7.)

This email from a disgruntled client does not make any reference to HOM's Facebook post, let alone identify the post as the source of its author's discontent. For all we know, the sender never read the Facebook post. The sender apparently has read publicly-available court filings, which are absolutely privileged and so cannot be defamatory. *Lacher*, 33 A.D.3d at 17. Moreover, the customer's displeasure clearly stems (at least in part) from dissatisfaction with the SBB Product itself, which she describes as "stripped . . . down to near nothing." She also refers to the opinions of lawyers "from a variety of states" as contributing to her demand for a refund. There is, therefore, nothing in the record to support a conclusion that HOM's Facebook post resulted in any damages to SBBI.

SBBI argues that its failure to demonstrate the existence of damages should not result in dismissal, citing *Lexington Prod. Ltd. v. B. D. Commc'ns, Inc.*, 677 F.2d 251, 253 (2d Cir. 1982), and *Randall-Smith, Inc. v. 43rd St. Estates Corp.*, 17 N.Y.2d 99, 106 (1966). But its argument fails. *Lexington* and *Randall-Smith* stand for the principle that, where the plaintiff has established, *with certainty*, the fact that some damages were suffered as a result of the

26

defendant's breach of contract, the court should not fail to award damages merely because the amount of those damages is uncertain. In *Lexington*, for example, the plaintiff provided two alternative methods of calculating damages, each of which the court deemed sufficient and not "speculative," making the district court's award of nominal damages of one dollar inappropriate. *Lexington*, 677 F.2d at 253.

Here, however, SBBI has not offered evidence that it suffered any damages as a result of HOM's erroneous Facebook post. It has produced no evidence tying any supposed drop-off in revenues to this post from HOM about this litigation. SBBI has failed to demonstrate the *existence* of damages, so the fact that they have not been quantified is of no moment.

Because SBBI cannot show that this Facebook post was either "defamatory" or "inflammatory," or that it resulted in any damages, SBBI cannot establish that HOM breached the JVDA by publishing this post.

### 2.  The Blog Posts on *The Middle Finger Project* Did Not Breach the JVDA

Statements in two of Ambirge's blog posts on *The Middle Finger Project* also do not breach the JVDA.

The two posts in question appear to have been published around October 20, 2014. (*See* Ambirge Dep. at 235:25-236:12.) SBBI identifies only three statements from the much longer posts that it argues are either defamatory or inflammatory.

The first statement reads: "I'm not sure how many times you've been involved in a federal litigation & lawsuit, but a few things are bound to happen," followed by a list of various effects, including, "Your eyebrows will instantly start sprouting (cruel) white hairs (not grey, not silver, *stark white*)," and "You'll have regular and recurring dreams about Judge Judy." (Bukher Decl. Ex. E at 1).

27

This statement is not defamatory. It is a hyperbolic description of the nasty and undesirable impact that federal litigation has on many people. It does not mention SBBI or Rodgers, or imply anything negative about them.

The second statement at issue states: "The common thread is that people with larger than life egos often have themselves on a pedestal—and they tend to make decisions from that mindset. . . . This is a problematic mindset, and for a couple of reasons: . . . It's reckless. . . . It hurts other people. . . . If you're professionally obligated to that person, you may hurt their business, too. . . . And most of all, you end up hurting yourself. . . . Because there are people out there like me who won't accept this kind of toxic attitude, and more importantly, won't be willing to simply shrug off the harmful consequences that arise as a result." (*Id.* at 2).

This second statement is also not defamatory as it is not "of and concerning" SBBI or Rodgers. It is about no one in particular – just "people with larger than life egos." And "an impersonal reproach of an indeterminate class is not actionable" for defamation. *Brady v. Ottaway Newspapers, Inc.*, 84 A.D.2d 226, 228 (2d Dep't 1981). Furthermore, the statement's description of such people is nothing more than opinion.

Ambirge's third statement reads: "There are things I've been prohibited from sharing with you—things that have been happening to me in the background for the entirety of 2014— that have included varying degrees of what many people might view as extortion, manipulation, fraud, and deceit . . . *by someone I know*. And someone you know, too." (Bukher Decl. Ex. F at 1 (emphasis original).)

For several reasons, this statement is not defamatory.

First, this statement is not "of and concerning" Rodgers or anyone else affiliated with SBBI. Whether a statement reasonably can be understood as "of and concerning" a plaintiff is

28

ordinarily a question of law for the Court to determine. *Gilman v. Spitzer*, 902 F. Supp. 2d 389,

394 (S.D.N.Y. 2012), *aff'd*, 538 F. App'x 45 (2d Cir. 2013).

Although Ambirge admitted at deposition that "someone I know" was Rodgers, (Ambirge

Dep. at 236:18-20), neither Rodgers nor SBBI is actually named anywhere in the blog post. The

only portion of the post that gives any context is one mention of an ongoing legal proceeding:

> I have kept my silence in an effort to resolve these issues in the only way I know
> how—ethically, and fairly—as ironic as that seems. I've spent far over $100,000+
> to date—$100,000 that has been comprised of your money as customers and
> clients, money from our company savings, and money from my personal
> retirement savings—to hire some of the world's greatest attorneys to help me. To
> help us.

(Bukher Decl. Ex. F at 1.)

A plaintiff's burden of showing that the allegedly defamatory statement is "of and

concerning" her is "not a light one*." Handelman v. Hustler Magazine, Inc*., 469 F. Supp. 1048,

1050 (S.D.N.Y. 1978). A plaintiff "must be clearly identifiable" from the statement in order for

the statement to be defamatory. *Abramson v. Pataki*, 278 F.3d 93, 102 (2d Cir. 2002). When, as

here, a plaintiff is not named in the publication itself, the plaintiff must show through extrinsic

facts that an "average reader" would understand the statement, when read in context, refers to the

plaintiff. *See Handelman*, 469 F. Supp. at 1051. "But where extrinsic facts are relied on to prove

the reference to a plaintiff, he must show that the conclusion that the publication refers to him is

reasonable and that the extrinsic facts upon which that conclusion is based were known to those

who read or heard the publication." *Bee Publications, Inc. v. Cheektowaga Times, Inc.*, 107

A.D.2d 382, 385 (4th Dep't 1985).

SBBI has provided no evidence to support the conclusion that an average reader would

understand that this statement was a reference to Rodgers. SBBI argues that this conclusion

could be inferred because HOM was, at the time, only involved in one legal proceeding with a

29

former partner. However, SBBI has presented no evidence showing that this extrinsic fact was known to any readers of HOM's blog. None of the emails from disgruntled customers in the record makes any reference to HOM's blog.

One commenter on Scott Greenfield's blog – that is, a *different* blog than the one run by Ambirge – commented on October 24, 2014:

> I recently subscribed to [Ambirge's] newsletter because I find her writing style entertaining. Over the past few weeks she's been teasing some year long ethical/legal battle she's been waging. . . .
>
> . . .
>
> Until I found [Greenfield's] blog I was under the impression she was fighting the likes of Amazon or Google.

(Bukher Decl. Ex. H at 6.) This comment supports the conclusion that an average reader would not be able to identify from the blog itself that SBBI was the other party to the legal proceeding with HOM or that Rodgers was the "someone I know" that Ambirge referenced. "Where, as here, the statement does not name the plaintiff[] at all and contains nothing that would cause a reader to think defendant was referring to [her], the statement is not "of and concerning" the plaintiff[]." *Three Amigos SJL Rest., Inc. v. CBS News Inc.*, 132 A.D.3d 82, 88 (1st Dep't 2015), *aff'd*, 28 N.Y.3d 82 (2016).

Second, even assuming that a reasonable reader could draw the connection between "someone I know" and Rodgers, the statement is still not defamatory because it cannot be proven false. This statement asserts that "many people might view" certain unspecified actions as "extortion, manipulation, fraud, and deceit." There is no way to verify the truth of Ambirge's statement that "many people" "might" characterize what we know to be an ongoing dispute between business partners in criminal terms.

Third, even if Ambirge's statement could be viewed as a direct allegation that Rodgers

engaged in "extortion, manipulation, fraud, and deceit," this vague statement is of the "loose,

figurative, or hyperbolic" sort that is not actionable for defamation. *Polish Am. Immigration*

*Relief Comm., Inc. v. Relax*, 189 A.D.2d 370, 373 (1st Dep't 1993); *see also Old Dominion*

*Branch No. 496 v. Austin*, 418 U.S. 264, 284 (1974) ("The . . . use of words like 'traitor' cannot

be construed as [a] representation[] of fact."); *Adelson v. Harris*, 774 F.3d 803, 807 (2d Cir.

2014) (concluding that description of money as "dirty" and "tainted" is "the sort of rhetorical

hyperbole and unfalsifiable opinion protected by the First Amendment"); *Chau v. Lewis*, 771

F.3d 118, 129 (2d Cir. 2014) ("[T]he epithets . . . 'sucker,' 'fool,' 'frontman,' 'industrial

waste,' . . . and 'crooks or morons' . . . are hyperbole and therefore not actionable opinion.").

In order to determine whether a statement is defamatory rather than merely hyperbole,

courts must look "at the content of the whole communication, its tone and apparent purpose."

*Immuno AG. v. Moor-Jankowski*, 77 N.Y.2d 235, 254 (1991).

In *Greenbelt Co-op. Pub. Ass'n v. Bresler*, 398 U.S. 6 (1970), the Supreme Court

addressed statements that are similar to the one at issue here. The case involved a local real estate

developer who was seeking to obtain certain zoning ordinances for a tract of land that he wished

to turn into a housing development. *Id.* at 7. At the same time, the developer owned another tract

of land that the town wished to acquire in order to build a school. *Id.* Various individuals at a

local city council meeting had accused the developer of engaging in "blackmail" for using the

school site as leverage to acquire the zoning ordinances. *Id.* The developer sued a local paper for

reprinting the word "blackmail," arguing it was libel. *Id.* at 8.

The Supreme Court held that the use of the word "blackmail" in that context was not a

provable assertion of fact, and was therefore not defamatory. "It is simply impossible to believe

31

that a reader who reached the word 'blackmail' in either article . . . could have thought that either

the speakers at the meetings or the newspaper articles reporting their words were charging

[plaintiff] with the commission of a criminal offense." *Id.* at 14. "On the contrary, even the most

careless reader must have perceived that the word was no more than rhetorical hyperbole, a

vigorous epithet used by those who considered [the developer's] negotiating position extremely

unreasonable." *Id.*

Obviously, an accusation of blackmail could be defamatory in another context. So too

could an accusation that an individual engaged in "fraud" or "extortion." However, the "tone and

apparent purpose" of Ambirge's blog post makes it clear that this is not an accusation of a

criminal offense, but the use of colorful language to describe her high level of frustration. *Mann*

*v. Abel*, 10 N.Y.3d 271, 276 (2008). Similar embellishments appear throughout the blog post. For

example, in the post's first paragraph, just before the "someone I know" line, Ambirge wrote:

> My fingers are constantly in motion, as I pick and pull and peel from the anxiety.
> When someone I love grabs my fingers and holds them down against my will, my
> body automatically defaults to using my teeth to skin my own lips, shred by shred,
> before moving on to force my tongue along my bottom row of teeth, catching on
> the crooked parts, over and over and over and over, to the point of madness.

(Bukher Decl. Ex. F at 1.) No reasonable reader would read this language and understand it to

mean that Ambirge was truly going insane. It is hyperbole, just like her exaggerated statement

that she was suffering from "varying degrees of what many people might view as extortion,

manipulation, fraud, and deceit." And hyperbole is "simply not actionable" for defamation.

*Gross v. N.Y. Times Co.*, 82 N.Y.2d 146, 152 (1993).

Similarly, Ambirge's use of the qualifying language "varying degrees of what many

people might view" rebuts the conclusion that she was making factual accusations of criminal

activity. In *600 W. 115th St. Corp. v. Von Gutfeld*, 80 N.Y.2d 130, 143 (1992), the New York

Court of Appeals examined the statement: "the lease and proposition [or composition] is as

fraudulent as you can get and it smells of bribery and corruption," made at a public meeting. The

court noted in particular that the use of the term "smells of" suggested that the speaker was being

hyperbolic. "Indeed, the figurative 'smells of' by its nature conveys to listeners that he has no

hard facts, only generalized suspicions." *Id.* Likewise, the phrase "many people might view" also

suggests that the author is expressing generalized assertions not grounded in hard facts. The

court also noted that the accusation of "bribery and corruption" was "devoid of reference to the

plaintiff or any other specific actors." *Id.* This further supported the conclusion that the statement

was not defamatory.

In short, the third statement from the blog posts is not defamatory because it is not a

statement of fact and it is not "of and concerning" Rodgers or SBBI. None of the statements

made in the blog posts is defamatory.

And, while colorful, the blog post statements are also not "inflammatory." These words

would not tend "to cause strong feelings of anger, indignation, or other type of upset." There is

certainly no evidence that any reader actually was "inflamed" by any of HOM's blog posts.

SBBI points to the emails from disgruntled customers as evidence that the posts were

inflammatory, but, as noted above, only one of the four emails post-dates the blog posts, and that

email does not make reference to HOM's blog or any statement by Ambirge other than

privileged court filings.

Finally, as discussed above, even if Ambirge's blog posts breached the JVDA's

prohibition on making defamatory and inflammatory statements, there is no evidence that SBBI

suffered any damages as a result.

### 3.  The Email Exchange with Greenfield Did Not Breach the JVDA

The final statement that SBBI argues breached the JVDA is contained in an email

exchange between Ambirge and Scott Greenfield, who wrote his own article about Rodgers titled

*Rachel Rodgers: Anything For A Quick Buck?*. (*See* DSUF Ex. 189.)[5] These private emails first

saw the light of day during discovery in this case.

On October 24, 2014, Greenfield emailed Ambirge a link to his article about Rodgers,

which was published on October 15, 2014. (*See* DSUF Ex. 189.) That article is highly critical of

Rodgers. It describes her as an "innovative twinkie lawyer" who considers herself unbound by

"ethics," and calls the SBB Product "simplistic nonsense surrounded by edgy copywriting."

(DSUF Ex. 189 at 1-4.)

In response to Greenfield's email, Ambirge replied:

Thanks for the link, Scott -

It's interesting.

I really *do* think it's a useful resource for people to get their heads around what
they don't know they don't know when it comes to legal (though I think my
current situation is a much better learning experience for all, which is why I've
chosen to share it) - and my intentions are entirely well-meaning - but never
would I recommend this as a substitute for an actual lawyer. (Much less one of
Rachel's caliber, as it seems.) So perhaps that view is still naive - but right now
it's important to focus on the real issue at hand: What can happen when you act
like a raging, irresponsible asshole.

But we were very pleased that the Honorable Colleen McMahon dismissed all of
RR's claims today in our preliminary hearing. And now, RR has to contend with
our counterclaims.

She's been tasked with providing a motion to dismiss our rescission - by Monday.

We'll see if she's successful.

(DSUF Ex. 188 at 1.)

---

[5] Although there are vague references in the record to earlier communications between Ambirge
and Greenfield over Twitter (*see* Rodgers Dep. at 32:12-25), no tweets were produced for the
Court and so any such tweets are not part of the record. (DSUF Ex. 188; *see* Pl.'s Mem. of Law
at 8, Dkt. No. 121.)

The allegedly defamatory or inflammatory statements in this email are: "Much less one of Rachel's caliber, as it seems," and "What can happen when you act like a raging, irresponsible asshole."

These statements are neither defamatory nor inflammatory. Ambirge's statement "Much less one of Rachel's caliber, as it seems" was an expression of her low opinion of Rodgers' abilities as a lawyer. Statements of opinion, unlike statements of fact, cannot be defamatory. This statement of Ambirge's opinion – hardly surprising, especially coming from someone who is suing her former attorney for malpractice – is also not inflammatory. Ambirge wrote it after Greenfield had already published his (highly critical) article about Rodgers. No reasonable trier of fact could conclude that Ambirge's email was likely to "stir [Greenfield's] passions" any further. As there is also no evidence that this email exchange was ever seen by anyone other than Greenfield and Ambirge until it was produced in discovery, it could not have "inflamed" anyone else, either.

Saying that someone acted like a "raging, irresponsible asshole" is also not an assertion of fact being capable of being proven true or false, so cannot be defamatory. *See Rich v. Associated Brands, Inc.*, No. 08 Civ. 666S F, 2011 WL 4402671, at *3 (W.D.N.Y. Sept. 22, 2011); *Kirkland v. City of Peekskill*, 634 F. Supp. 950, 951 (S.D.N.Y. 1986). Given the context of the email, it was also not likely to cause Greenfield to experience any strong feelings of anger, so is not inflammatory.

After Ambirge sent her email, Greenfield responded:

> Also, I hope you understand that I don't think your intentions were bad or that you're responsible for what I believe to be a terribly misguided legal effort. You aren't a lawyer. You aren't responsible for being a lawyer. There is a reason lawyers have ethical duties, as you're no doubt painfully aware at this point.

> I've been fairly harsh with RR about her ethical issues for a long
> time. This is why. I have nothing against her personally, but she
> cannot play fast and loose with other people's lives to make herself
> cool, marketable or to make a quick buck.

(DSUF Ex. 188 at 1.)

As this email makes clear, Greenfield's similarly poor opinion of Rodgers did not stem

from communications with Ambirge but had formed "a long time" before these emails. In

response, Ambirge sent a second email to Greenfield:

> I am grateful to you and to the others who have brought this to light, both in the
> past and presently.
>
> I believe RR is now in the process of filing a disparagement claim against me, but
> I'd rather tell the truth and prevent this from happening to others, than sit around
> like a coward in silence.
>
> I have not commented on your blog because I was advised not to for that reason.
> But know that I applaud you and your fellow lawyers who uphold your duty to
> ethics - because if you can't trust your own lawyer, who can you trust?
>
> It's a scary world - especially when you're trying to take risks and make your
> mark on the world. I hope being public about this will serve as a warning to others
> who would ever think to be such unethical, unscrupulous unprofessionals - and at
> the very least, make it a little safer for us all.

(*Id.*)

The allegedly defamatory or inflammatory statement in this email is the reference to

"unethical, unscrupulous unprofessionals," which, in the context of the email chain, is clearly a

reference to Rodgers. This statement is not defamatory. Calling someone an "unethical,

unscrupulous unprofessional[]," like any generic accusation "that someone has acted

unprofessionally or unethically," is a "constitutionally protected statement[] of opinion." *Wait v.*

*Beck's N. Am., Inc.*, 241 F. Supp. 2d 172, 183-84 (N.D.N.Y. 2003); *see Celle v. Filipino*

*Reporter Enterprises Inc.*, 209 F.3d 163, 178 (2d Cir. 2000). This statement of opinion does not

"imply the existence of undisclosed underlying facts" that would make it defamatory. *Gross*, 82

36

N.Y.2d at 153. Absent some more specific factual allegations, Ambirge's statement is "no more than rhetorical hyperbole." *Rizzuto v. Nexxus Prods. Co.*, 641 F. Supp. 473, 481 (S.D.N.Y.), *aff'd*, 810 F.2d 1161 (2d Cir. 1986).

Furthermore, SBBI has put forward no evidence of damages that resulted from this purely private email exchange between Ambirge and Greenfield. This doubly dooms its claim.

Because SBBI has failed to demonstrate that any of Ambirge's or HOM's statements qualifies as "defamatory" or "inflammatory," and because SBBI has presented no evidence whatsoever of damages caused by these statements, HOM is entitled to summary judgment dismissing Count 2.

### B. Count 7: HOM's Motion for Summary Judgment Dismissing SBBI's Defamation Claim Is Granted; SBBI's Cross-Motion for Summary Judgment in Its Favor Is Denied

SBBI separately asserts that each of the statements discussed above (the Facebook post, the blog posts, and the email exchange) constitutes common-law defamation.

The standards for common-law defamation are identical to the standards used to determine whether a statement is "defamatory" for purposes of SBBI's breach-of-contract claim. The statement must be: (1) a defamatory statement of fact; (2) that is false; (3) published to a third party; (4) "of and concerning" the plaintiff; (5) made with the applicable level of fault on the part of the speaker; (6) either causing harm or constituting slander *per se*; and (7) not protected by privilege. *Albert v. Loksen*, 239 F.3d 256, 265-66 (2d Cir. 2001).

For the reasons just discussed, none of these statements constitutes defamation of SBBI.

As discussed *supra* Part II.A.1, HOM's Facebook post (although inaccurate) did not expose SBBI to "public contempt, ridicule, aversion or disgrace, or induce[s] an evil opinion of [it] in the minds of right-thinking persons." *Foster*, 87 N.Y.2d at 751.

As discussed *supra* Part II.A.2, none of the statements in the blog posts on *The Middle Finger Project* meets the standards for common-law defamation. None of the statements is "of and concerning" SBBI, and all of the statements are rhetorical hyperbole, not statements of fact.

As discussed *supra* Part II.A.3, the purely private email exchange with Greenfield did not contain any defamatory statements of fact about Rodgers or SBBI.

Not every unkind word is grounds for a lawsuit; it is not necessary to make a federal case about every slight or difference of opinion. SBBI was not defamed by anything that HOM or Ambirge wrote. HOM is entitled to summary judgment dismissing Count 7.

## III.   SBBI's Other Claims (Counts 3 and 8)

### A.   Count 3: HOM's Motion for Summary Judgment Dismissing SBBI's Breach-of-Contract Claim Is Granted; SBBI's Cross-Motion for Summary Judgment in Its Favor Is Denied

Count 3 seeks damages resulting from HOM's offering of the Sentences and Money course in violation of JVDA § 11.1. That provision prohibited HOM from, "becom[ing] involved or engaged in a business, or plan[ning] to become involved or engaged in a business that provides legal services, or sells products or goods (including books, e-books, and other works of authorship) that contain legal advice)," during the term of the agreement. (JVDA § 11.1.)

As this Court already explained at length, in its previous order denying SBBI a preliminary injunction to block the offering of the Sentences and Money course, there was "overwhelming" evidence that the course, as initially designed, would have violated the JVDA. (*See* Order Den. Prelim. Inj. at 11, Dkt. No. 99.) The course was originally marketed to include a "special guest expert" presentation by Antigone Peyton, an intellectual property attorney who was slated to provide attendees with information on how to structure contracts and service agreements. (*Id.* at 9-10.) It was indisputable that this offering would have constituted the sale of a product or good "that contain[s] legal advice," in violation of the JVDA.

However, HOM never offered that course. After the hearing, HOM modified the Sentences and Money course to excise the portions that contained legal advice. SBBI agreed that the course, as reconstituted, did not violate the JVDA. (*See* Order Den. Prelim. Inj. at 18.) HOM also provided refunds to customers who did not wish to participate in the course with the legal advice segments removed. (DSUF ¶¶ 125-26; PCSUF ¶¶ 125-26.)

There is no way, under these circumstances, that HOM breached the JVDA. HOM may have *intended* to breach the JVDA, but, thanks to SBBI's rapid response, it was never able to. Count 3 must also be dismissed.

### B.    Count 8: HOM's Motion for Summary Judgment Dismissing SBBI's Declaratory Judgment Claim Is Granted; SBBI's Cross-Motion for Summary Judgment in Its Favor Is Denied

Count 8 seeks a declaratory judgment, pursuant to 28 U.S.C. § 2201, that SBBI is the owner of the TXu Registrations that HOM assigned to it. A party seeking a declaratory judgment bears the burden of demonstrating under the "totality of circumstances" standard that an "actual controversy" exists in order to establish the existence of subject matter jurisdiction. *Nintendo of Am. Inc. v. Magnavox Co.*, 659 F. Supp. 894, 895 (S.D.N.Y. 1987). In the context of intellectual property, this requires a showing that the plaintiff has "a reasonable apprehension that it will face an infringement suit if it commences or continues the activity in question." *Jervis B. Webb Co. v. S. Sys., Inc.*, 742 F.2d 1388, 1398 (Fed. Cir. 1984).

There is no dispute that HOM validly assigned ownership of those copyrights to SBBI (along with the TX Registration) pursuant to the terms of JVDA § 2.2, and recorded that assignment with the Copyright Office on September 30, 2015. (DSUF Ex. 84.) There is, therefore, no controversy here warranting declaratory judgment. SBBI has produced no evidence whatsoever to suggest that HOM is likely to instigate an infringement suit regarding the TXu Registrations. HOM has admitted to this Court that its assignment was valid.

39

Since there is no controversy for the Court to adjudicate over the validity of the TXu

Registration assignment, Count 8 is dismissed for lack of subject matter jurisdiction.

## IV.    HOM's Counterclaims

### A.    Counterclaim 1: SBBI's Cross-Motion for Summary Judgment Dismissing HOM's First Counterclaim for Breach of Contract Is Granted in Part and Denied in Part; HOM's Motion for Summary Judgment in Its Favor Is Denied

HOM's first counterclaim alleges that SBBI breached the JVDA in five separate ways.

(*See* Def.'s 2d Am. Countercls. ¶¶ 277-289.) Like SBBI, HOM must establish the four elements

of a breach of contract on its counterclaims: (1) a valid contract; (2) substantial performance by

the non-breaching party; (3) breach; and (4) damages. *Johnson*, 660 F.3d at 142.

First, HOM alleges that SBBI breached its obligation to provide HOM with a "link . . .

for HOM to effectuate sales" of the SBB Product as required by JVDA § 3.4.

The contract does not set a deadline by which SBBI had to provide HOM with this link.

Therefore, SBBI was obligated to provide the link within a "reasonable time." *Saivest*

*Empreendimentos Imobiliarios E. Participacoes, Ltda v. Elman Inv'rs, Inc.*, 117 A.D.3d 447,

449 (1st Dep't 2014).

The record is clear that HOM had a functioning link within three days of signing the

JVDA. (*See* Ambirge Dep. at 161:3-163:16.) By any stretch of the imagination, that is a

"reasonable" time. The link functioned well enough to allow HOM to make at least $10,000

worth of sales in June 2014, the first month of the license agreement. (*See* Order Den. Prelim.

Inj. at 12-13.) Finally, HOM has proffered no evidence of any damages that resulted from any

delay in providing the link – no data on lost sales or any other damages.

Second, HOM alleges that SBBI breached the JVDA by raising the price of the SBB

Product from $295 to $495. But the JVDA did not prohibit SBBI from raising the price of the

SBB Product. (*See* JVDA §§ 3.5, 3.7.) Therefore, raising the price cannot possibly constitute a breach of the contract.

Third, HOM alleges that SBBI breached the JVDA by temporarily halting sales of the SBB Product as a sales tactic. But the JVDA did not prohibit SBBI from halting sales of the SBB Product. In fact, the parties agreed to *delete* a clause in the JVDA that would have prevented SBBI from discontinuing sales of the SBB Product, which eliminates any doubt on this question. (*Id.* § 3.5 (struck text).)

Fourth, HOM alleges that SBBI breached the JVDA by releasing an updated version of the SBB Product called "Small Business Bodyguard+" that removed references to Ambirge as a co-author. SBBI was not required, by the JVDA or by any law, to continue to credit Ambirge as a co-author of the SBB Product in future versions of the product that were released after the joint venture ended. (*See id.* § 2.2.) The JVDA permitted SBBI to offer periodic updates and modifications to the SBB Product. (*See id.* § 3.1.) Nothing in the record suggests that the offering of the "Small Business Bodygaurd+" product was anything more than an update to the work that HOM had assigned to SBBI through the JVDA. Absent a specific contractual obligation on SBBI to credit Ambirge as a co-author following the termination of the joint venture, Ambirge has no inherent right to attribution. *See Graham v. James*, 144 F.3d 229, 236 (2d Cir. 1998) (quoting 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 8D.03[A][1]).

And so we come to the fifth allegation: SBBI breached the JVDA by interfering with HOM's ability to utilize its license, by improperly using the DMCA takedown procedure to deactivate several of HOM's websites.

In its initial takedown request, made on August 19, 2014, SBBI asked HOM's web hosting provider BlueHost to remove the HOM SBB Website – but not any of HOM's other

websites, including *The Middle Finger Project*. (DSUF Ex. 140 at 2-3.) As already discussed, the HOM SBB Website infringed the SR Registration owned by SBBI. SBBI, therefore, had every right to seek deactivation of the HOM SBB Website under the DMCA. *See* 17 U.S.C. § 512(c). There was, therefore, nothing wrong with SBBI's original takedown request.

However, BlueHost deactivated HOM's entire account on August 21, 2014, on the ground that HOM had violated its terms of service. (*See* DSUF Ex. 143.) Shortly thereafter, on September 9, 2014, SBBI sent an additional notice to BlueHost, listing the HOM web pages that SBBI wanted to remain deactivated. Among those were fourteen pages on *The Middle Finger Project* website. SBBI's ostensible reason for asking that those pages remain deactivated was because they included references to the SBB Product and links to the HOM SBB Website. (*See* DSUF Ex. 144; Rodgers Dep. at 24:14-25:14; 46:21-57:25.) BlueHost did in fact keep those fourteen pages deactivated, pursuant to its corporate policy not to reactivate websites that are subject to ongoing litigation. (*See* DSUF Ex. 144 at 1.)

Only four of the fourteen *The Middle Finger Project* web pages at issue have been provided to the Court, and none of them appears to contain infringing content. (*See* DSUF Ex. 145; DSUF ¶ 105.) Therefore, the issue cannot be resolved now.

There exists an outstanding issue of fact about whether SBBI's second email interfered with HOM's ability to exercise its license under the JVDA and thus breached the contract. Neither party is entitled to summary judgment on this one discrete portion of HOM's first counterclaim.[6] The remainder of this counterclaim is dismissed.

---

[6] It appears that HOM is seeking damages in the sum of a little more than $5,000. (*See* DSUF Ex. 148.) This is not a breach of contract claim that belongs in federal court.

42

**B.     Counterclaim 2: SBBI's Cross-Motion for Summary Judgment Dismissing HOM's Second Counterclaim for Breach of Contract Is Granted in Part and Denied in Part; HOM's Motion for Summary Judgment in Its Favor Is Denied in Part and Granted in Part**

HOM's second counterclaim asserts three additional breaches of the JVDA by SBBI.

(*See* Def.'s 2d Am. Countercls. ¶¶ 290-301.)

First, HOM alleges that SBBI failed to timely make commission payments to HOM for product sales. The record establishes that HOM accepted payments for its June and July 2014 commissions on August 30, 2014. (Ambirge Dep. at 163:17-21; *see* PSUF ¶ 29; DCSUF ¶ 29.)

The JVDA provides that commission payments are due to HOM "on or before the last calendar day of the following month" after the sales are generated. (JVDA § 3.10.) That means that the June 2014 payment was due July 31, 2014, and the July 2014 payment was due August 31, 2014. The July 2014 payment was timely, but the June 2014 payment (for $10,127) was late by thirty days.

The only damages HOM asserts for this breach is the lost interest and the "use of expected capital." Under New York law, the remedy for a delay in payment under a contract is limited to damages in the form of interest at the prevailing legal rate. *E.g.*, *Meinrath v. Singer Co.*, 87 F.R.D. 422, 426 (S.D.N.Y. 1980). That rate is 9% per annum, meaning that, for the thirty-day delay in making payment of $10,127, HOM is entitled to damages of $74.91.

Second, HOM alleges that SBBI improperly calculated the base value of its commissions for sales made in installments. The JVDA provides that, for the first two years of the license agreement, HOM would earn a commission "equal to 100% of the Gross Sales Price for each completed HOM sale." (JVDA § 3.7.) "Gross Sales Price" is defined in the JVDA as the "full *retail* price charged by RRC to consumers." (*Id.* (emphasis added).)

43

Case 1:14-cv-07170-CM    Document 133    Filed 01/31/17    Page 44 of 53

The retail price of the SBB Product at the time was $495. Consumers could elect to purchase the SBB Product by making either one $495 payment or two $277 payments. Those who chose the installment plan option would ultimately pay $59 more – an amount SBBI characterizes as a "finance fee." SBBI did not include the $59 in the base on which it calculated HOM's commissions, based on the justification that finance charges were not part of the "full retail price." (PSUF ¶ 123; Ambirge Dep. at 167:2-168:12; Order Den. Prelim. Inj. at 13.)[7]

The $59 was not a portion of the "full retail price" and thus it did not need to be included in the base from which HOM's commissions were calculated. The "full retail price" of the SBB Product was $495 – the price advertised to consumers. The additional $59 was a charge imposed on individuals who chose not to make full payment for the SBB Product when they purchased it. Such amount is known as a "finance charge." A finance charge is the "cost of credit, including interest, paid by a customer for a consumer loan." Dictionary of Finance and Investment Terms (9th ed. 2014). The $59 was the cost of credit for consumers who chose to buy the SBB Product in installments. It was a charge imposed on top of the "retail price" of the SBB Product. Therefore, SBBI did not breach the JVDA by excluding it when calculating HOM's commissions.

Third, HOM alleges that SBBI failed to provide certain reports and information to HOM about HOM's sales as required by the JVDA. The JVDA provides: "HOM has the right to request from RRC a report of RRC's records and calculations of Commissions owed to HOM for HOM Sales. And RRC agrees to provide such a report whenever HOM makes a request under this Paragraph of the Agreement." (JVDA § 3.9.) It also provides in another section: "RRC

---

[7] The amount over which the parties are fighting is $470 – an appropriate sum for small claims court.

agrees to provide to HOM, upon HOM's request, with a verifiable description of the referral partner settings (or other mechanism(s), as the case may be) used by RRC to track HOM Sales and to ensure accurate Commission payments for each and every HOM Sale." (*Id.* § 3.6.)

Emails exchanged between HOM's attorney and Rodgers show that HOM first requested referral partner settings on June 20, 2014. Rodgers asked for clarification about which settings HOM needed. This was because HOM had access to the Affiliate Center, a website that allowed HOM to see the exact number of consumers who clicked on HOM's affiliate link and how many went on to purchase the SBB Product or opt-in to the Small Business Bodyguard mailing list. (*See* DSUF Ex. 122.) It was not clear to Rodgers what other metrics HOM was requesting. (*Id.*) It appears from the emails that Rodgers offered to prepare a report of any additional information that HOM wanted to see, but there is no record of communications after that point. Ultimately, SBBI never transmitted a report.

Whether SBBI satisfied its obligations under JVDA § 3.6 and § 3.9 by providing HOM with real-time access to information via the Affiliate Center is a disputed issue of fact that must be determined at trial. It is undisputed that SBBI did not provide HOM with any kind of "report" regarding its referral settings, but the record is unclear about whether this constituted a breach of the JVDA.

In sum, HOM is entitled to partial summary judgment in its favor, but only for the 30-day delay of the June 2014 commission payment. SBBI is entitled to summary judgment dismissing the retail price / commissions issue. The referral partner settings issue goes to trial.

**C.** **Counterclaim 5: SBBI, Rodgers, and RRLO's Cross-Motion for Summary Judgment Dismissing HOM's First Counterclaim for Breach Fiduciary Duty Is Granted; HOM's Motion for Summary Judgment in Its Favor Is Denied**

HOM's fifth counterclaim asserts that Rodgers and RRLO breached their fiduciary duties as HOM's lawyers by establishing the joint venture with a client. *Weil, Gotshal & Manges, LLP v. Fashion Boutique of Short Hills, Inc.*, 10 A.D.3d 267, 271 (1st Dep't 2004).

Attorneys are not *per se* prohibited from entering into business transactions with their clients, as long as the attorney does not "take advantage of [her] superior knowledge and position." *Greene v. Greene*, 56 N.Y.2d 86, 92 (1982). HOM has not even alleged, let alone offered evidence, that anything about the JVA was fraudulent or unfair, or that HOM and Ambirge lacked the full knowledge of material facts they needed to enter the contract. The JVA's terms do not suggest Rodgers "got the better of the bargain." *Sun Forest Corp. v. Shvili*, 152 F. Supp. 2d 367, 395 (S.D.N.Y. 2001) (quoting *Mar Oil, S.A. v. Morrissey*, 982 F.2d 830, 839 (2d Cir. 1993)). If anything, Rodgers and SBBI had far more responsibilities under the JVA than HOM, yet received only half of the profits. There is simply no evidence in the record that Rodgers abused her position as HOM's attorney when entering the JVA. SBBI is, therefore, entitled to summary judgment dismissing this counterclaim.

**D.** **Counterclaim 6: SBBI, Rodgers, and RRLO's Cross-Motion for Summary Judgment Dismissing HOM's Second Counterclaim for Breach Fiduciary Duty Is Granted; HOM's Motion for Summary Judgment in Its Favor Is Denied**

HOM's sixth counterclaim essentially argues that Rodgers, RRLO, and SBBI breached their fiduciary duties to the joint venture by reimbursing SBBI for certain expenses while not reimbursing HOM for its expenses, and by withholding the April and May 2014 profit payments from HOM.

On the reimbursement issue, the JVA clearly establishes that SBBI was permitted to reimburse expenses of the joint venture before distributing profits. (PCSUF ¶¶ 24-26; JVA §§ 4.1-4.2.) HOM cannot prove that SBBI breached its fiduciary duty by doing something that the parties' contract expressly permitted. Moreover, HOM has failed to produce any evidence that it tried to obtain reimbursement of its own expenses but was refused.

On the profit payments issue, it is not disputed that SBBI paid HOM its share of the April and May 2014 profits on June 7, 2014 – the same date that the parties signed the JVDA. (PCSUF ¶¶ 22-23; Rodgers Dep. at 141:22-142:25; *see* JVDA § 1.2.) Unlike the June and July 2014 commission payments discussed *supra* Part IV.B, these profit payments were made pursuant to the JVA, not the JVDA. And unlike the JVDA, the JVA provided no deadline for when monthly profits were to be distributed – only that they were to be paid "on a monthly basis" after expenses and various fees were deducted. (JVA § 4.1.) Absent such a contractual provision, the law implies that payment is due within a "reasonable time." *Saivest Empreendimentos Imobiliarios E. Participacoes, Ltda*, 117 A.D.3d at 449.

These payments were not unreasonably delayed. The April 2014 payment was made approximately thirty-seven days after the end of the calculating month, and the May 2014 payment was made about a week after the end of the calculating month. This timing was reasonable, given that SBBI had to deduct fees and expenses from the month's revenues before it could distribute profits.

Furthermore, when the parties negotiated the JVDA, they specifically agreed that these two payments would be made on the date the JVDA was executed, June 7, 2014. (JVDA § 1.2.) Which they were. This superseding agreement makes any arguable breach of the original JVA irrelevant. SBBI is entitled to summary judgment dismissing this count as well.

47

E.     **Counterclaim 7: SBBI, Rodgers, and RRLO's Cross-Motion for Summary Judgment Dismissing HOM's First Counterclaim for Malpractice Is Granted in Part and Denied in Part; HOM's Motion for Summary Judgment in Its Favor Is Denied**

HOM's seventh counterclaim asserts that Rodgers and RRLO committed legal malpractice by failing to file the correct tax election form for HOM and for mishandling the trademark application for *The Middle Finger Project*.

A plaintiff must establish three elements for a claim for legal malpractice under New York law: (1) negligence of the attorney – that is, a failure "to exercise the ordinary reasonable skill and knowledge commonly possessed by a member of the legal profession"; (2) that the negligence was the proximate cause of the loss; and (3) proof of actual and ascertainable damages. *Dombrowski v. Bulson*, 19 N.Y.3d 347, 350 (2012) (quoting *Rudolf v. Shayne, Dachs, Stanisci, Corker & Sauer*, 8 N.Y.3d 438, 442 (2007)); *see also Prudential Ins. Co. of Am. v. Dewey Ballantine, Bushby, Palmer & Wood*, 170 A.D.2d 108, 114 (1st Dep't 1991), *aff'd*, 80 N.Y.2d 377 (1992). "To succeed on a motion for summary judgment in a legal malpractice action, the defendant must establish that the plaintiff cannot prove at least one of these essential elements." *Stonewell Corp. v. Conestoga Title Ins. Co.*, 678 F. Supp. 2d 203, 209 (S.D.N.Y. 2010).

First, Rodgers advised Ambirge to register HOM as an S-corporation and Ambirge signed the S-corporation election form in 2013. (DSUF ¶¶ 60-61.) HOM alleges that Rodgers failed to file the form with the IRS, resulting in HOM's registration as a C-corporation, which exposed it to the possibility of $40,000 in additional tax liability. (*Id.* ¶ 62.) HOM only avoided paying the additional taxes by expending attorney's fees and paying a $195 late fee to the IRS, totaling $1,320. (*Id.* ¶ 64; *see* DSUF Ex. 95.)

48

Rodgers and RRLO submit that Rodgers properly filed the S-corporation election form, and produced (after discovery) documents purportedly "from the ifax provider" that show that the form was submitted to the IRS on June 4, 2013. (*See* Bukher Decl. Ex. S.)[8] Rodgers testified that she "was ready, willing, and able" to correct the election "at no additional cost to HOM." (Rodgers Decl. ¶ 76.) Rodgers admitted, however, that she never followed up with the IRS regarding the status of the form during the period while she remained HOM's counsel. (Rodgers Dep. at 58:2-11.)

The question thus becomes: Did Rodgers fail to transmit the S-corporation election form or did the IRS misplace it? If Rodgers failed to submit the form, that could constitute professional negligence. *See, e.g.*, *Estate of Smith By & Through Smith v. Underwood*, 487 S.E.2d 807, 816 (N.C. 1997) (upholding jury verdict finding failure to file S-corporation election form constituted a breach of professional duty of care). However, if the IRS misplaced the form, Rodgers' actions likely do not constitute a deviation from the standard of care.

If Rodgers was negligent, HOM has produced evidence supporting the other elements of its malpractice claim: proximate cause and damages. There is no dispute that, but for the issue with the form, HOM "would have succeeded on the merits of the underlying action," *Davis v. Klein*, 88 N.Y.2d 1008, 1009-10 (1996) – that is, it would not have been exposed to the additional tax liability, as evidenced by the success of HOM's new counsel in correcting the error. It is also undisputed that, as a result of this increased exposure, HOM hired alternate counsel to prepare and file the S-corporation election form, resulting in a $195 late fee and $1,150 in additional legal fees. (*See* DSUF Ex. 95.) Such damages would be recoverable under

---

[8] The "ifax" documents, while not produced during discovery, will nonetheless be admissible at the bench trial, subject to cross examination about their provenance.

New York law. *Affiliated Credit Adjustors, Inc. v. Carlucci & Legum*, 139 A.D.2d 611, 613 (2d

Dep't 1988); *Hinman, Straub, Pigors & Manning, P.C. v. Broder*, 89 A.D.2d 278, 281 (3d Dep't

1982).[9]

Given this outstanding issue of material fact, we must proceed to trial on this $1,345

malpractice claim.

HOM also alleges that Rodgers committed malpractice in connection with its trademark

application. On June 24, 2013, Rodgers filed a trademark application with the PTO for HOM's

flagship brand, *The Middle Finger Project*. (DSUF ¶ 65.) On December 30, 2013, the PTO

issued a substantive office action refusing to register the mark based on the "immoral or

scandalous matter" provision in Section 2(a) of the Trademark Act, due to the use of the term

"middle finger." (*Id.* ¶ 66; *see* DSUF Ex. 98 at 2-4.) HOM had six months to respond to this

office action – until June 30, 2014. (*See* DSUF Ex. 98 at 1-2.)

It is undisputed that Rodgers and RRLO did not inform Ambirge of the office action until

after Rodgers and RRLO ceased serving as HOM's attorneys on February 20, 2014. (PCSUF

¶¶ 67-70.) HOM then hired its own counsel and successfully defended the application prior to

the June 30, 2014 deadline.

Rodgers did not commit malpractice. Rodgers did not "[n]egligent[ly] or willful[ly]

withhold[] . . . information material to [her] client's decision to pursue a course of action."

*Schweizer v. Mulvehill*, 93 F. Supp. 2d 376, 397 (S.D.N.Y. 2000). Her failure to tell Ambirge

about the PTO letter *immediately* after it was received, or to draft a response when there were

months left before the deadline, did not constitute a "failure" to defend HOM's trademark

application. The application was successfully defended before the deadline. No evidence

---

[9] In small claims court.

suggests that Rodgers' conduct "fell below the ordinary and reasonable skill and knowledge commonly possessed by a member of the profession." *Bernstein v. Oppenheim & Co., P.C.*, 160 A.D.2d 428, 430 (1st Dep't 1990).

Rodgers and RRLO are, therefore, entitled to summary judgment dismissing this portion of HOM's seventh counterclaim.

**F.    Counterclaim 8: SBBI, Rodgers, and RRLO's Cross-Motion for Summary Judgment Dismissing HOM's Second Counterclaim for Malpractice Is Granted; HOM's Motion for Summary Judgment in Its Favor Is Denied**

HOM's eighth counterclaim involves another trademark application filed by Rodgers, this time for the joint venture.

Rodgers represented in the Small Business Bodyguard trademark application that the name "Small Business Bodyguard" had been used in commerce since as early as June 21, 2013. HOM argues that this is false, because no products were sold to customers until July 24, 2013. (DSUF Ex. 48; *see* DSUF ¶¶ 27-32.) HOM also argues that RRC falsely informed the PTO that an assignment of the trademark was pending before the parties formally agreed to dissolve the joint venture. (*Id.* ¶ 37-43.)

There is no evidence that these alleged misrepresentations – if they ever occurred – resulted in any injury to HOM. As far as the record indicates, the Small Business Bodyguard trademark application resulted in a registration. No one is seeking to challenge the validity of the trademark registration. There is also no dispute that HOM did eventually agree to assign the trademark to SBBI, as part of the JVDA.

HOM's complete failure to assert the existence of a pecuniary loss caused by Rodgers' actions – an essential element of a legal malpractice claim under New York law – means that SBBI, Rodgers, and RRLO's cross-motion for summary judgment must be granted. *See Wilson v. City of N.Y.*, 294 A.D.2d 290, 292 (1st Dep't 2002).

**Conclusion**

For the foregoing reasons, HOM's motion for summary judgment (Dkt. No. 110) is GRANTED dismissing Counts 1, 2, 3, 4, 6, 7, 8, and 9 of SBBI's amended complaint. It is GRANTED IN PART AND DENIED IN PART as to HOM's first and second counterclaims. It is DENIED as to Count 5, and DENIED as to HOM's fifth, sixth, seventh, and eighth counterclaims.

SBBI, Rodgers, and RRLO's cross-motion for summary judgment (Dkt. No. 120) is GRANTED as to Count 5, and GRANTED dismissing HOM's fifth, sixth, and eighth counterclaims. It is DENIED as to Counts 1, 2, 3, 4, 6, 7, 8, and 9 of SBBI's amended complaint and HOM's first counterclaim. It is GRANTED IN PART AND DENIED IN PART as to HOM's second and seventh counterclaims.

HOM is entitled to damages in the amount of $74.91 for its second counterclaim.

As no party has moved for summary judgment on HOM's third or fourth counterclaims, those claims will proceed to trial, along with the remaining portion of HOM's first counterclaim, on the DMCA takedown issue, the remaining portion of HOM's second counterclaim relating to the referral partner settings issue, and the remaining portion of HOM's seventh counterclaim, for malpractice regarding the S-corporation election form. The amount of statutory damages for Count 5, SBBI's claim for copyright infringement, will also be determined at trial.

The Clerk of the Court is directed to remove Dkt. Nos. 110 and 120 from the Court's list of pending motions.

Dated: January 31, 2017

_____
U.S.D.J.

BY ECF TO ALL COUNSEL